2020 IL App (1st) 171512

FIFTH DIVISION
OCTOBER 30, 2020

No. 1-17-1512

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 1631 (04) |
| | ) | |
| JESUS VILLALOBOS, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Hoffman and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial in the circuit court of Cook County, the defendant-appellant, Jesus Villalobos, was convicted of first degree murder and sentenced to 40 years' imprisonment. On appeal, the defendant contends that the trial court improperly denied his motion to suppress and erred in sentencing him. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3    The State charged the defendant and his codefendants, Luis Valdez, Gonzalo Guerrero, Elena Rios, and Ray Guereca, with the following crimes: aggravated kidnapping of Shaun Jurgens and Raymond Jerz; first degree murder of Raymond Jerz; armed robbery and aggravated battery of Shaun Jurgens; and mob action. The defendant was 16 years old at the time of the crimes. The State ultimately proceeded against the defendant on only the charge of first degree murder. Prior

to his trial, the defendant filed a motion to suppress.

¶ 4                        Motion to Suppress Hearing

¶ 5     A hearing commenced on the defendant's motion to suppress his videotaped statement in which he gave an inculpatory statement. The defendant based his motion on the assertion that the police had continued questioning him after he invoked his right to counsel. The defendant testified that, on December 5, 2012, he was arrested in Burly, Idaho, where he had been staying with a relative. After being held in a detention facility in Idaho for two weeks, Chicago police detectives Greg Jacobson and Mary Nanninga, along with Cook County Assistant State's Attorney Andres Almendarez (ASA Almendarez) came to Idaho to bring the defendant back to Chicago. They began talking with the defendant in the detention facility, but the defendant told them that he wanted an attorney. The two detectives and ASA Almendarez then "said okay and walked off" and did not ask the defendant any more questions.

¶ 6     The next day, the two detectives and ASA Almendarez picked up the defendant from the detention center and began the trip back to Chicago. They drove for 2½ hours to the Salt Lake City airport. The defendant testified that, approximately an hour into the drive, they stopped at a rest stop. Detective Nanninga and ASA Almendarez exited the car to use the restroom, leaving the defendant alone in the car with Detective Jacobson. According to the defendant, during that time, Detective Jacobson started "talking about the case" and telling the defendant that he "knew everything that happened that night." He also told the defendant that "all [his] rappies were pointing their fingers at [him] saying [he] did everything and that if [he] didn't help [himself], that [he] was going to be in a lot of trouble." Detective Jacobson's comments made the defendant feel scared, but he did not respond. Detective Nanninga and ASA Almendarez then returned to the car,

and Detective Jacobson stopped talking to the defendant.

¶ 7    Once the group arrived in Salt Lake City, they stopped at a restaurant, where Detective Jacobson took the defendant to the restroom alone. The defendant testified that, once he was alone with Detective Jacobson inside the restroom, Detective Jacobson started talking about the case again. He told the defendant that he was young and needed to help himself. The defendant did not respond. They then returned to the table and ate lunch with Detective Nanninga and ASA Almendarez. Afterwards, they went to the airport.

¶ 8    According to the defendant, once inside the airport, Detective Nanninga and ASA Almendarez "went up to *** show *** the tickets." The defendant stayed back with Detective Jacobson, who "was getting mad." He again told the defendant that he "already knew everything and that all [his] rappies were tricking on [him]," so there was no point in staying silent. Detective Jacobson also told the defendant that he was "going to be in jail a long time," but if he talked to him and told his side of the story, Detective Jacobson would "talk to the judge" and "put in a word *** to get time knocked off." The defendant felt afraid that if he did not talk to Detective Jacobson he would "be in jail for a long time." However, he still did not respond. Later, Detective Jacobson took the defendant to the restroom inside the airport. They were alone together inside the restroom, and Detective Jacobson told the defendant that he was going to be charged with murder if "he didn't tell him nothing." The defendant continued to remain silent.

¶ 9    On the plane, Detective Jacobson sat next to the defendant, ASA Almendarez sat in front of him, and Detective Nanninga sat across the aisle. Detective Nanninga started "naming all [the defendant's] rappies' nick names and people that were possibly involved in the case." She told the defendant that those people had "told on" him, that they were not his friends, and that he needed

to help himself. Detective Jacobson joined in the conversation and told the defendant that, if he talked to them, "they would talk to the judge for [him] to try to give [him] a lower sentence." The defendant started thinking about his "freedom" and decided to give a statement to the police when they landed. Once they arrived in Chicago, they went to the police station, and the defendant gave a videotaped statement. For the videotaped statement, the defendant waived his right to counsel, but his mother was with him.

¶ 10    Detective Jacobson testified at the suppression hearing that he was assigned to investigate the murder of Raymond Jerz. A warrant was issued for the defendant's arrest, and on December 12, 2012, Detective Jacobson traveled to Burly, Idaho, with his partner (Detective Nanninga) and ASA Almendarez to extradite the defendant to Chicago. They went to the detention center to speak with the defendant, but he requested an attorney after being Mirandized, and the conversation ceased. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 11    The following day, the two detectives and ASA Almendarez began transporting the defendant back to Chicago. They drove to the Salt Lake City airport and stopped at a rest stop along the way. At the rest stop, Detective Jacobson and ASA Almendarez took the defendant into the restroom together. Detective Jacobson testified that he was never alone in the car with the defendant and he never began a conversation with the defendant about the case.

¶ 12    Detective Jacobson further testified that they later stopped at a restaurant in Salt Lake City. Inside the restaurant, he was never alone with the defendant and never spoke with the defendant about the case. He did take the defendant to the restroom inside the restaurant, but ASA Almendarez accompanied them.

¶ 13    According to Detective Jacobson, he was never alone with the defendant at the airport and

never gave him any legal advice. He took the defendant to the restroom at the airport, but again ASA Almendarez accompanied them. On the plane, Detective Jacobson sat next to the defendant. During the flight, the defendant suddenly asked Detective Jacobson "who snitched on" him. Detective Jacobson responded by informing the defendant that, because he had asked for an attorney, he could not speak to him about the case. The defendant stated, "everybody must have snitched on me I want to tell my side of the story." The defendant then told Detective Jacobson that he would give him a statement without an attorney, but he requested that his mother be present with him for the statement. Detective Jacobson told the defendant that, as soon as they landed, they would contact his mother. The conversation then ended.

¶ 14 Upon their arrival in Chicago, the defendant was transported to the police station. His mother arrived a few hours later. Detective Jacobson re-Mirandized the defendant in the presence of the defendant's mother and Detective Nanninga. The defendant then provided a videotaped statement to the police, which was played for the trial court.

¶ 15 At the beginning of the videotaped statement, Detective Jacobson said to the defendant: "Let me hear your side of it. If you know everybody else is telling on you. That's what you told me. You said, everyone's tricking on you, right?" The defendant responded by saying, "You told me that." Detective Jacobson replied, "Okay."

¶ 16 On cross-examination, defense counsel questioned Detective Jacobson about that exchange:

> "Q. [Y]ou were talking to [the defendant] and you said to him, you know
> that people were snitching on you. You told me that. He responded, no, you told
> me that. Indicating that you, Detective, told him that someone was snitching on

him, correct?

A.  That's correct.

***

Q. You said, okay, after he said you told him that?

A. Yes, I did.

***

Q. [Y]ou did not say I did not tell you that; did you?

A. No, I did not.

Q. You did not deny that you had told him that; did you?

A. No, I did not."

¶ 17    ASA Almendarez testified about the group's trip from Idaho to Chicago. He testified that, when their group stopped at the rest stop, he went into the restroom with Detective Jacobson and the defendant. When they were all at the restaurant, he and Detective Jacobson took the defendant into the restroom together. Detective Jacobson was never alone with the defendant, and he never heard Detective Jacobson speak to the defendant about the case.

¶ 18    During arguments on the motion, the defendant argued that it was "a case of credibility" and that the trial court should find him more credible than Detective Jacobson and ASA Almendarez. He claimed that his testimony was corroborated by the videotaped statement, at the part where the defendant told Detective Jacobson, "you told me that" everyone was "tricking on [me]," and Detective Jacobson replied, "Okay." The defendant maintained that the numerous comments made by Detective Jacobson during the trip "[got] into his head" and changed his "sound decision" to have an attorney present. The defendant argued that, accordingly, his fifth amendment

right to remain silent and his sixth amendment right to counsel were violated and so the trial court should suppress his videotaped statement.

¶ 19 The trial court denied the defendant's motion to suppress. In its ruling, the trial court stated that, by asking for an attorney initially in Idaho and then later asking for his mother, the defendant appeared to be "sophisticated and worldly" for his age and did not appear to be "intimidated by *** law enforcement." The trial court concluded:

"At no time is there any indication that the police were beating him or depriving him of bathroom privileges or food or water or anything of the sort. No type of physical intimidation or coercion. There is a suggestion somehow that there must have been some conversation because of this colloquy about well everybody else ratted on you and the defendant, [the defendant] saying, no, you told me that and the detective saying, okay. There can be conversations where somebody says, well, it was this way and the other person says, no, it was that way and the first person says, okay. Okay is not necessarily meaning, yes, you're right I'm wrong. Okay. Is just alright. We have a disagreement. We have a misunderstanding between us. Okay is just a way of pausing things. It's neither an admission nor denial. It's an ambiguous term. I don't know that I have clear evidence on this record that somehow there was some manipulation going on, that they were trying to take advantage of this young person on the way from—that he invoked his rights on the tape, insisted on seeing his mother when he was on tape again and did get to see his mother, that somehow in between during the travel periods that there was all kind of pressure that was put on him and things were told to him that

conversation reinitiated. As a matter of fact it did not appear that conversation reinitiated until his mom was there and that was at the request of the defendant."

¶ 20                                    Trial

¶ 21    A bench trial commenced, and the following evidence was presented.[1]

¶ 22    On February 10, 2012, two friends, Raymond Jerz and Shaun Jurgens, attended a party in Chicago near 26th Street and Kedzie Avenue. Both Jerz and Jurgens lived in the suburbs, and a friend had driven them to the party in her car with some other friends. At the party, the driver's purse was stolen. Her car keys were in her purse, and so the group had no way to get home. At approximately 3 a.m., Jerz and Jurgens walked to a nearby restaurant, Los Comales, while the rest of their friends waited at the party with the car. Inside the restaurant, Jerz and Jurgens ordered some food and sat down to eat. As they ate, they started making phone calls to try to find someone to give them a ride home.

¶ 23    Jurgens went into the restroom at Los Comales, where he encountered the defendant, along with two of his codefendants, Luis Valdez and Ray Guereca. Jurgens testified that the defendant and his friends were being loud and that he could tell they were in a gang. He was not scared of them, though. He believed they were members of the Satan Disciples street gang, or at least members of an affiliated and larger street gang, known as Folks. Jurgens had been a member of the Satan Disciples between the ages of 13 and 19. Although he was no longer a member of the Satan Disciples, he still had the six-point star and pitchfork tattoo on his right leg, which signified his prior membership.[2]

---

[1]The defendant's trial was separate from his codefendants' trials.
[2]The record reflects that Jerz had never been affiliated with any gangs.

¶ 24   Jurgens approached the defendant, Valdez, and Guereca and offered them $20 to drive him and his friends to the nearest train station so that they could get home. Jurgens, believing them to be members of the Satan Disciples or Folks street gang, displayed the tattoo on his leg. In response, the defendant and his friends told Jurgens: "Hey, it's cool, Folks. We'll help you out."

¶ 25   However, the defendant and his friends were only pretending to be members of the Satan Disciples or Folks street gang. They were actually members of the Latin Kings street gang, who are rivals of the Satan Disciples. And the Latin Kings street gang is a part of the larger gang faction known as the People Nations, who are rivals of the Folks street gang. Had Jurgens suspected that the defendant and his friends were members of the Latin Kings or People Nations, he would not have interacted with them.

¶ 26   Off-duty Chicago police officer Joseph Oskvarek was working security at Los Comales that night.[3] He observed the defendant, Valdez, and Guereca come into the restaurant and then go to the restroom. He recognized that they were dressed like Latin Kings. Officer Oskvarek then saw Jurgens walk into the same restroom and became concerned for him since there were three Latin Kings in there. Officer Oskvarek opened the restroom door and saw Jurgens showing his leg tattoo to the three Latin Kings. He asked, "[I]s everything okay in here?" to which Guereca responded, "Everything is good." Officer Oskvarek left the restroom but still thought "this ain't good." The State published pictures from Los Comales' security footage which showed the defendant, Valdez, and Guereca entering the restaurant as described by Officer Oskvarek.

¶ 27   All of the men exited the restroom. Jurgens told Jerz that the defendant and his group were

_____

[3]In addition to being a police officer, Officer Oskvarek worked as a part time security guard at Los Comales.

going to pick up their other friends still at the party and then give them all a ride to the train station. The group left Los Comales and entered a minivan behind the restaurant. Jerz and Jurgens shared the middle-row seat with the defendant and Valdez. Guereca took the driver's seat. Codefendant Elena Rios sat in the passenger's seat.

¶ 28     When Guereca drove out of the parking lot, Jurgens noticed that Guereca began driving in the opposite direction from 26th Street and Kedzie Avenue, where his other friends were waiting. This caused Jurgens to feel concerned, although he and Jerz mostly remained silent. Jurgens eventually asked Guereca where they were going, and Guereca told him they were "going to get some weed." Guereca drove for five minutes into a neighborhood with which Jurgens was unfamiliar. The neighborhood turned out to be in "the heart of Latin Kings territory." During the five-minute drive, the defendant made a phone call to some of his friends and pretended to be a member of the Folks street gang, saying things such as "folks, we got this." He also pointed to some people at a gas station and called them "Flakes," a derogatory term for Latin King members.

¶ 29     Guereca stopped the van on a residential street in front of a garage door, at the entrance to an alley. Everyone exited the van except for Jerz and Jurgens. An SUV then arrived and parked next to the van, and more people emerged from the SUV. Suddenly, Jerz and Jurgens were dragged out of the van and into the street, in a space between the van and the SUV. The defendant, his codefendants, and the others who had arrived in the SUV began beating Jerz and Jurgens. Jurgens felt himself being punched and kicked all over his body. He heard people yelling "Kill them, Folks," "Kill them SDs," and "SDK," which stands for Satan Disciples Killer.

¶ 30     Jurgens managed to temporarily break away from the people beating him. He saw Jerz down the street being kicked and punched by at least five people. Jurgens ran toward Jerz, but

Guereca hit him across the forehead with a metal pipe, which "totally dazed" him. He then ran across the street to try to escape. As he ran, he felt Guereca, Valdez, and codefendant Gonzalo Guerrero grabbing at him. Jurgens was able to pull away from them, but Guereca and Guerrero continued to chase him. Jurgens was still running when he suddenly heard three gunshots, which caused him to freeze.

¶ 31   Meanwhile, Miguel Humberto Martinez was driving home from work. His house was located close to where the van and SUV had parked. Martinez testified that, as he drove up to the entrance of the alley, he saw Guereca, Valdez, and Guerrero beating Jurgens. Martinez honked his car horn and then saw Jurgens briefly escape, followed by Guereca and Guerrero chasing him. He looked across the street and saw Jerz trying to cover his face as Valdez, Rios, and others beat him. He saw Jerz try to get up, but Valdez grabbed him and held him down while the others continued to punch him.

¶ 32   The defendant's group then left Jerz lying in the street and entered the van. Valdez began driving the van, which accelerated toward Jerz. Martinez thought the van was going to run over Jerz, but it turned at the last minute and sped away. Right then, the defendant appeared in the street, alone. He hit Jerz a few times as Jerz laid on his stomach in the street. The defendant then grabbed a gun from his waistband and shot Jerz three or four times in the back. Afterwards, the defendant ran off.

¶ 33   Right after Jurgens heard the gun shots, he ran down to a street corner and realized that he was no longer being chased. He heard police sirens coming from the area he had last seen Jerz, so he headed back. When he returned to the area, he saw that the van, the SUV, and the people who had beat him were all now gone. Jurgens saw Jerz lying facedown on the street. Jerz was

nonresponsive and covered in blood and bullet holes; he was later pronounced dead at the scene.

¶ 34    Investigators arrived at the scene and discovered Guereca's cell phone. They also recovered surveillance video from Los Comales, which showed the defendant and his group leaving with Jerz and Jurgens. The police began arresting the defendant's codefendants, and an arrest warrant was issued for the defendant. On December 5, 2012, the defendant was arrested in Idaho by United States Marshals. The defendant was subsequently transported back to Chicago, where he gave a videotaped statement admitting to shooting Jerz. Jurgens later identified the defendant in a police lineup as one of the men who had been in the restroom with him and then beat him. Martinez also identified the defendant in a lineup as the person who shot Jerz.

¶ 35    Detective Mary Nanninga testified regarding the investigation, including the defendant's arrest and his videotaped statement. The videotaped statement was then admitted into evidence and published during the trial. In his videotaped statement, the defendant admitted he wanted to "f*** [Jerz and Jurgens] up" when he saw them at Los Comales. He eventually admitted to shooting Jerz four times.

¶ 36    On cross-examination, defense counsel asked Detective Nanninga questions regarding the defendant's extradition from Idaho to Chicago. The following exchange ensued:

"Q. First stop was at a rest stop so people could relieve themselves?

A. Yes.

Q. And at that point my client was alone in the car with Detective Jacobson while yourself and the State's Attorney went into the building to use the facilities?

Q. Yes.

A. Okay. And then a second stop was made at a restaurant to get food,

correct?

Q. Yes.

Q. And being a female—for the record you are a female, correct?

A. Yes.

Q. You could not take my client to the bathroom, correct?

A. Correct.

Q. So, at that time your partner took my client to the bathroom without yourself present?

A. Yes.

Q. And without the State's Attorney present?

A. Yes.

***

Q. And your partner, Detective Jacobson, stayed with the Defendant, my client, in the terminal while you obtained the tickets, correct?

A. Yes.

Q. And you, again, when he went to the bathroom—when I say he, you couldn't take him to the bathroom?

A. I could not.

Q. And Detective Jacobson took him to the bathroom alone?

A. Yes.

Q. Without the State's Attorney?

A. Yes.

Q. And during the times that Detective Jacobson had him in the bathroom you were not present and was not aware of what was said?

A. Yes.

Q. And that includes the time at the rest stop?

A. Yes.

Q. And the time at the restaurant, correct?

A. Yes.

Q. As well as at the airport, correct?

A. Yes."

¶ 37 Following Detective Nanninga's trial testimony, the defendant moved to reconsider his motion to suppress on the basis that Detective Nanninga's testimony contradicted Detective Jacobson's and ASA Almendarez's testimony that Detective Jacobson was never alone with the defendant. A hearing was held on the defendant's motion to reconsider. At the hearing, the defendant argued that Detective Nanninga's testimony impeached Detective Jacobson's testimony and supported the defendant's claim that Detective Jacobson had reinitiated the conversation when he was alone with the defendant. The defendant argued that, numerous times, Detective Jacobson encouraged him to "tell his side of the story," even though the defendant had already invoked his right to counsel. He claimed that the "cumulative effect of each of those encounters" wore on him on the flight to Chicago, and so he "became nervous" and told Detective Jacobson that he wanted to talk, ultimately leading to his videotaped statement without counsel. The defendant argued that, because Detective Nanninga's testimony supported his own testimony while contradicting Detective Jacobson's, the trial court should reconsider and grant his motion to suppress his

videotaped statement.

¶ 38   In response, the State reminded the trial court that ASA Almendarez testified consistently with Detective Jacobson that he was never alone with the defendant. The State also stated that its position was that Detective Nanninga was mistaken in her testimony.

¶ 39   Following the parties' arguments, the trial court denied the defendant's motion to reconsider his motion to suppress. The trial court stated:

> "The fact of the matter is there was an extremely violent homicide that took place in Chicago. Detectives were all over, a warrant was issued for [the defendant]. He had fled the jurisdiction and was all the way up in the state of Idaho.
>
> Federal Marshals contacted the Chicago police to say that they had caught him on a warrant, and they had to go there to bring him back. There was going to be contact between [the defendant] and law enforcement to bring him back to Chicago because to get from Idaho to Chicago there's going to be plane rides, and car rides to get to the plane, and it's going to take a little while. It's not something that you do instantly.
>
> It's not like he [was] arrested in Chicago and it's a 10 minute ride to the police station. They had to get together over a period of time. [The defendant] did testify at the [m]otion to suppress about things that happened between he and Detective Jacobson according to him, and he said that on a few occasions that they were alone, he was urging him to talk that he had gotten all of the information from his rappies and homies.
>
> And he needed [the defendant] to help himself, Detective Jacobson could

do nothing for him unless somehow he could help himself, and all of those times [the defendant] had indicated that he never changed his position that he didn't want to talk, he didn't want to make a statement, and there was nothing substantive about the case that was gathered.

But I'm being urged now by [defense counsel] is that there was constant pressure. The pressure that I'm hearing about it's not that they were beating him up, or threatening to use physical harm, but the pressure is that hey, it's probably in your best interest to talk to me instead of not talking to me. I can't help you unless you talk to me, you're going to be tried as an adult unless you talk to me.

And the defendant's response, at that time, was that he wanted to talk to his mom, and he never entered into any kind of substantive conversations with Detective Jacobson. Come finally back to Chicago [the defendant] has been asking repeatedly apparently for his mother, his mother was brought right into the room with him. She was there, there was Detective Jacobson came to see where they were at. [The defendant] indicated that he wanted a lawyer, and mom said that she wanted to talk to a lawyer. Detective Jacobson he literally stepped back, and you can see him hesitate, stop, take a step back, put his arms up, and then said well, I can't talk to you. There's nothing I can do, and then with the mother present [the defendant] seem[ed] to consider his circumstances and agreed that he would talk to him and that he had been Mirandized and Mirandized again.

People frequently change their minds about whether they want to invoke or not invoke. They invoke and then they think it may[ ]be in their best interest to talk

that maybe by talking about it they may mitigate their situation. I didn't see any evidence in this case that any of the law enforcement either the detectives or State's Attorney[ ] that went to Idaho to get [the defendant] from where he had fled this jurisdiction to he went as far away as he could get and stay in this country that they were trying to beat him up, or trying to do some things that, that Chicago police officers may have been accused of in other times, nothing like that is alleged here. The only thing that's alleged is that Detective Jacobson was suggesting to him that it's in his best interest to talk, and [the defendant] I will note that even though he was 16 he appeared to be articulate, he appeared oriented, he appeared actually somewhat bright for his age, and seem to understand his surroundings, he knew what his rights were because he started talking about a lawyer, he asked for his mother, had his mother, and the environment changed, and his mother was there.

And I think reality started to sink in. He's back in Chicago, his mom is there, and while he's there and then he just had a change of heart. Looking at all of this in its totality, I don't believe the police abused him or violated any rights under the Fifth and Sixth Amendment, I don't think there was any kind of pressure that would make what he said later unconstitutional. I watched the tape along with everybody else. I did not see any evidence of coercion to suppress the statement."

¶ 40 The trial then continued, and the State rested. The defendant's mother testified on his behalf. She testified that she lived with the defendant "half a block" from where Jerz was shot. The defendant did not testify.

¶ 41    At the conclusion of the trial, the trial court found the defendant guilty of first degree murder and found that the defendant had personally discharged the firearm that caused Jerz's death.

¶ 42                                    Sentencing

¶ 43    At the sentencing hearing, the State presented victim impact statements from Jerz's parents. In mitigation, the defendant pointed out that he did not have a criminal history prior to this case. His mother and sister both testified and explained that the defendant's father was not in his life and that the defendant got involved in gang activity after he was shot during a drive-by shooting.

¶ 44    Discussing the recent trends in sentencing juveniles, the trial court declined to impose the 25-years-to-life firearm enhancement. The trial court noted that the sentencing range was between 20 and 60 years, and it stated:

> "I understand that [the defendant] was 16 years old at the time that he picked up that gun and shot [Jerz] in the back and left him on the street the way he did. I know he had no other criminal history and he comes from a family that cares about him, but he shot somebody in the back.
>
> It was unnecessary. It was gratuitous violence. It's left lasting scars on everybody's family. I don't know that within the sentencing code I have any ways to make things better for people. But I will have to find justice as it is and within the range I have to deal with."

The trial court then sentenced the defendant to 50 years' imprisonment.

¶ 45    The defendant filed a motion to reconsider sentence based on the fact that 50 years was a *de facto* life sentence. At a hearing on the motion, the trial court stated:

> "[The defendant] was 16 years old at the time of the offense. The courts of

review from the United States Supreme Court on down to other courts of review, the Illinois Supreme Court and the Illinois Appellate Court, have been on a steady drum roll talking about the fact that judges need discretion to consider youth as a factor in sentencing to say that mandatory sentences are to be suspect.

*** 

This case, perhaps more than most, is one that I think for anybody that experienced any part of it, they heard about in the courtroom, will haunt them for the rest of their lives. It is an urban nightmare in the fullest extent.

***

This never should have happened. I know he is young. I know the courts are telling me to look at his age, but I have to look at the crime as well, the impact that it has had on the families of the deceased and the impact that something like this has had on society.

I am mindful that this is a hundred percent sentence. And I will, in light of what I am being told by the courts of review, reconsider the sentence. I can be moderate to a degree but only to a degree."

The trial court then resentenced the defendant to 40 years' imprisonment. This appeal followed.

¶ 46                                    ANALYSIS

¶ 47    We note that we have jurisdiction to review the trial court's judgment, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 48    The defendant presents the following two issues: (1) whether the trial court erred in denying the motion to suppress; and (2) whether the trial court erred in imposing a sentence of 40 years' imprisonment.

¶ 49    The defendant first argues that the trial court erred when it denied his motion to suppress and again later when it denied his motion to reconsider that denial. He claims that his videotaped statement should have been suppressed because Detective Jacobson reinitiated the conversation about the case after the defendant had invoked his right to counsel. The defendant contends that his testimony about Detective Jacobson reinitiating the conversation is supported by Detective Nanninga's testimony that Detective Jacobson was alone with the defendant several times during the trip from Idaho to Chicago. The defendant further avers that his videotaped statement corroborates his claim when the defendant told Detective Jacobson, "you told me that" everyone was "tricking on [me]," and Detective Jacobson replied, "Okay." He accordingly argues that his videotaped statement should have been suppressed.

¶ 50    "An appeal from a trial court's ruling on a motion to suppress presents mixed questions of fact and law." *People v. Boswell*, 2014 IL App (1st) 122275, ¶ 20. This court accords great deference to the trial court's factual and credibility determinations and will disturb them only if they are against the manifest weight of the evidence. *Id.* However, we review *de novo* the ultimate legal question posed by the trial court's ruling. *Id.* In our review, we may consider testimony presented at trial, as well as that provided at the suppression hearing. *People v. Petty*, 2017 IL App (1st) 150641, ¶ 21.

¶ 51    A criminal defendant has a constitutional right to counsel at all custodial interrogations, as provided by both the United States and Illinois Constitutions. U.S. Const., amends. V, XIV; Ill.

Const. 1970, art. I, § 10. "Once a defendant invokes that right, the police cannot interrogate him further unless the accused initiates further communication, exchanges, or conversations with the police." *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). The purpose of this rule is to prevent the police from badgering a defendant into waiving his previous assertion of his right to counsel. *Id.*

¶ 52    There is no dispute in this case that the defendant invoked his right to counsel when the police initially arrived in Idaho. Where the dispute arises is *who* later reinitiated the conversation during the trip back to Chicago. As the defendant concedes, this is a matter of credibility. During the suppression hearing, the defendant testified that Detective Jacobson reinitiated conversations about the case several times when the two of them were alone during the trip. Yet Detective Jacobson testified that he was *never* alone with the defendant. And his testimony was supported by ASA Almendarez's testimony that he accompanied Detective Jacobson every time he took the defendant to the restroom. The trial court gave their testimony greater weight than the defendant's testimony, and we see no basis for finding that to be against the manifest weight of the evidence. See *People v. Clark*, 2014 IL App (1st) 130222, ¶ 26 (where findings of fact depend on the credibility of witnesses, a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence).

¶ 53    During the trial, Detective Nanninga testified that Detective Jacobson was alone with the defendant several times during the trip. In particular, she testified that they were alone briefly at restroom stops and the airport terminal, which was contrary to Detective Jacobson and ASA Almendarez's testimony. However, minor discrepancies in witness testimony do not automatically render the testimony incredible. *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 17. And it is the

responsibility of the trier of fact to resolve such discrepancies. *People v. Gray*, 2017 IL 120958, ¶ 35. The trial court in this case having resolved the discrepancies in favor of the State, we see no reason to disagree with that determination. The testimony conflicts revolve around minor discrepancies occurring during brief restroom stops. It was a long, group trip, in which the participants could have easily been mistaken about minor details. Notably, as the only female in the group, Detective Nanninga was not responsible for accompanying the defendant to the restroom, so it is understandable that her attention may not have been focused on the restroom groupings and activity of the men in the party. The two male members of the extradition party, to whom that responsibility fell, were unequivocal in their testimony that the defendant was never alone with Detective Jacobson. Clearly, the trial court concluded that, based upon their testimony, there was no opportunity for Detective Jacobson to reinitiate the conversation with the defendant in a clandestine way. The trial court did not have to find that Detective Nanninga's testimony was untrue in order to reach its conclusion, as there was ample evidence for the court to rely upon; including the testimony of the two male members of the extradition party who were responsible for accompanying the defendant during restroom stops. Thus, we cannot say that Detective Nanninga's testimony, standing alone, made the trial court's finding, that Detective Jacobson did not reinitiate the conversation with the defendant, against the manifest weight of the evidence. See *Clark*, 2014 IL App (1st) 130222, ¶ 26 (a finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence).

¶ 54 Nevertheless, the defendant argues that the trial court "entirely sidestepped the issue of whether the police unlawfully re-initiated a conversation" and instead improperly focused on

whether the police "beat" or "intimidated" the defendant into making his statement. However, it was important for the trial court to find that the police did not physically coerce the defendant into revoking his assertion of his right to counsel. If the police had done so, it would have rendered the defendant's subsequent statement involuntary. *People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009) (in determining whether a statement is voluntary, a trial court must consider the totality of the circumstances of the particular case, including any physical or mental abuse by the police). Notwithstanding its determination that there was no physical coercion, the trial court *also* determined that the police did not reinitiate the conversation with the defendant, stating:

> "I don't know that I have clear evidence on this record that somehow there was some manipulation going on, that they were trying to take advantage of this young person on the way from—that he invoked his rights on the tape, insisted on seeing his mother when he was on tape again and did get to see his mother, *that somehow in between during the travel periods that there was all kind of pressure that was put on him and things were told to him that conversation reinitiated*. As a matter of fact it did not appear that conversation reinitiated until his mom was there and that was at the request of the defendant." (Emphasis added.)

That was ample basis for the trial court to deny the defendant's motion to suppress.

¶ 55    The defendant makes much of the fact that, in his videotaped statement, when he said to Detective Jacobson, "you told me that" everyone was "tricking on [me]," Detective Jacobson replied, "Okay." The defendant contends that this was an admission by Detective Jacobson that he told the defendant that his "rappies" "tricked" on him so he might as well "tell his side of the story." However, as pointed out by the trial court, "okay" is an ambiguous term that neither

confirmed nor denied the defendant's comment. Specifically, in rejecting the defendant's argument on this point, the trial court stated: " 'Okay' is just a way of pausing things. It's neither an admission nor denial." Not to mention that Detective Jacobson, a seasoned detective, probably knew that if he responded with something such as, "no, I did not," it likely would have derailed the defendant's statement. All things considered, Detective Jacobson's mere statement of "okay" is insufficient to find that he reinitiated the conversation with the defendant.

¶ 56    There are many other scenarios under which the defendant may have decided that it was in his interest to speak with the detectives. It is not uncommon for a defendant to invoke his right to counsel and then later change his mind. See, *e.g.*, *People v. Stolberg*, 2014 IL App (2d) 130963, ¶ 40. When a defendant initiates further conversations with the police, he waives the right to counsel that he had previously invoked. *Id.* As the facts of this case support such a finding, we affirm the trial court's denial of the defendant's motion to suppress. And because the defendant repeated the same arguments in his motion to reconsider that denial and we rejected his only additional argument regarding Detective Nanninga's testimony, the denial of his motion to reconsider is also affirmed.

¶ 57    The defendant next challenges his sentence of 40 years' imprisonment. He argues that it was an improper sentence for three alternative reasons: (1) it is a *de facto* life sentence that violates the eighth amendment; (2) it violates the proportionate penalties clause of the Illinois Constitution; and (3) it is excessive. We take each argument in turn.

¶ 58    The defendant first argues that his sentence of 40 years is a *de facto* life sentence, which violates the eighth amendment since he is a juvenile. After the defendant filed his opening brief, our supreme court filed *People v. Buffer*, 2019 IL 122327, which held that a prison sentence of 40

years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment. Nonetheless, the defendant argues, in his reply brief, that the supreme court in *Buffer* "did not clearly delineate whether a *de facto* life sentence is a sentence of '40 years or more' or if it only includes sentences that are 'more than 40 years.' " He alternatively argues that, even if *Buffer* did draw the line at "more than 40 years," his sentence still violates the eighth amendment because it is essentially a sentence of 43 years total with his three-year mandatory supervised release (MSR) added on.

¶ 59 The defendant raises an as-applied constitutional challenge, which requires a showing that his sentence violates the constitution as it applies to the facts and circumstances of his case. *People v. Thompson*, 2015 IL 118151, ¶ 36.[4] An as-applied constitutional challenge is a legal question that we review *de novo*. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 97.

¶ 60 "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). The United States Supreme Court in *Miller* held that mandatory life-without-parole sentences imposed on juveniles are unconstitutional under the eighth amendment because they prevent the trial court from considering numerous mitigating factors, such as the defendant's age and immaturity. *Id.* at 489.

¶ 61 Our supreme court has expanded *Miller* to hold that a life sentence, whether natural or *de facto*, whether mandatory or discretionary, is unconstitutional for juveniles where the trial court did not consider the mitigating factors listed in *Miller*. *People v. Reyes*, 2016 IL 119271, ¶ 9

_____

[4]In contrast, a facial challenge requires a showing that the sentence is unconstitutional under any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant. *Thompson*, 2015 IL 118151, ¶ 36.

(*per curiam*) ("A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison."); *People v. Holman*, 2017 IL 120655, ¶ 40 (life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers the defendant's youth and its attendant characteristics).

¶ 62    Following some inconsistency among various panels and districts of this court regarding the precise number of years that represent a *de facto* life sentence, our supreme court recently addressed *de facto* life sentences for juveniles in *Buffer*. There, the supreme court explicitly "[chose] to draw a line at 40 years." *Buffer*, 2019 IL 122327, ¶ 40. Specifically, it held that "a prison sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (Internal quotation marks omitted.) *Id.* ¶ 41.

¶ 63    As our supreme court has now established that a prison term of "40 years or less" does not constitute a *de facto* life sentence (*id.*), the defendant's argument, that it is unclear if the line is drawn at 40 years or 41 years, is specious. There is no way to interpret "40 years or less" as "40 years or more." Since the defendant's sentence is 40 years' imprisonment, it does not constitute a *de facto* life sentence.

¶ 64    The defendant otherwise argues that his sentence is, in essence, 43 years with his three-year MSR added on and therefore constitutes a *de facto* life sentence. In support of this argument, the defendant cites the following quote from our supreme court in *Round v. Lamb*, 2017 IL 122271, ¶ 16: "MSR term is included in the sentence as a matter of law." However, viewing that quote in

its entire context, it concerned the trial court's failure to include the MSR term in the written sentencing order. *Id.* Although MSR is part of the sentence in which the defendant remains in the custody of the Department of Corrections, it is *not imprisonment*, and that is an important distinction. See *People v. Williams*, 66 Ill. 2d 179, 187 (1977) (MSR alters the method and degree of confinement). We accordingly reject this argument.

¶ 65    In sum, the defendant's sentence of 40 years is not a *de facto* life sentence and therefore does not violate the eighth amendment.

¶ 66    The defendant alternatively argues that his sentence violates the proportionate penalties clause of the Illinois Constitution because it is a disproportionate sentence. He claims that his crime, "while serious, reflects the immaturity and impulsivity associated with juvenile offenders" and that it was influenced by peer pressure. He also stresses his lack of criminal history and his potential for rehabilitation.

¶ 67    Similar to the eighth amendment, a challenge under the proportionate penalties clause of the Illinois Constitution "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005); Ill. Const. 1970, art. I, § 11 ("[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship"). A defendant's sentence is in violation of the proportionate penalties clause where the penalty imposed is " 'cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community.' " *Sharpe*, 216 Ill. 2d at 487 (quoting *People v. Moss*, 206 Ill. 2d 503, 522 (2003)). To determine whether a sentence shocks the moral sense of the community, we must consider objective evidence as well as the community's changing standard of moral decency. *People v.*

*Barnes*, 2018 IL App (5th) 140378, ¶ 18.

¶ 68    In support of his argument, the defendant directs our attention to *People v. Aikens*, 2016 IL App (1st) 133578, and *Barnes*, 2018 IL App (5th) 140378. In both cases, it was held on appeal that the juvenile defendant's sentence shocked the moral sense of the community and therefore violated the proportionate penalties clause. *Aikens*, 2016 IL App (1st) 133578, ¶¶ 37-38; *Barnes*, 2018 IL App (5th) 140378, ¶ 26. However, in those cases, the specific part of the sentence that violated the proportionate penalties clause was the mandatory firearm enhancement. *Aikens*, 2016 IL App (1st) 133578, ¶¶ 37-38; *Barnes*, 2018 IL App (5th) 140378, ¶ 26. By contrast, in the case at hand, the trial court specifically *declined* to impose the firearm enhancement, explicitly citing the recent shift in sentencing juveniles. Thus, *Aikens* and *Barnes* are inapplicable.

¶ 69    The defendant nevertheless claims that his sentence of 40 years violates the proportionate penalties clause because the trial court did not consider his youth and rehabilitative potential. He stresses that he had a difficult upbringing and no criminal history, which the trial court should have factored into his sentence. We note that, if we were to give the defendant the relief he seeks, it would require us to remand the case to the trial court for consideration of the very facts and circumstances that the record clearly shows the trial court took into consideration in determining the defendant's sentence. The record shows that the trial court specifically considered the defendant's age, familial background, and criminal history.

¶ 70    However, we also note that the trial court appropriately considered the seriousness of this heinous crime. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 55 (the most important factor in sentencing is the seriousness of the offense). The trial court stated that this offense was an act of "gratuitous violence" that will leave "lasting scars on everybody's family." It even went so far as

to state that those who heard the "urban nightmare" described in the courtroom will forever be "haunt[ed]" by it. It cannot be underscored enough that, after the defendant's group left Jerz lying in the street, the defendant approached him alone and shot him several times in the back; all because he thought Jerz was part of a rival gang. It was a particularly brutal crime warranting a severe sentence. We do not find that the defendant's sentence is disproportionate to the offense so as to shock the moral sense of the community. Therefore, it does not violate the proportionate penalties clause.

¶ 71 The defendant's final argument is that his 40-year sentence is excessive. Specifically, he claims that the trial court failed to "adequately consider the statutory mitigating factors applicable to juvenile offenders," especially the defendant's familial issues, his trauma from being shot in a drive-by shooting, and his struggle with gang peer pressure.

¶ 72 A sentence within the appropriate sentencing range is generally accorded great deference by this court. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 65. We accordingly will not alter a defendant's sentence absent an abuse of discretion. *Id.* "Our supreme court has found that, with respect to a sentence, an abuse of discretion occurs when the sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense." *Id.*

¶ 73 The sentencing range in this case was 20 to 60 years, and so the defendant's 40-year sentence falls well within that range and is therefore presumed to be proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Nevertheless, the defendant argues that the trial court abused its discretion in sentencing him because it did not consider the following mitigating factors required for juvenile defendants pursuant to section 5-4.5-105 of the Unified Code of Corrections:

"(1) the person's age, impetuosity, and level of maturity at the time of the

offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West 2016).

¶ 74    As we have already discussed, the record shows that the trial court *did* carefully and *explicitly* consider these mitigating factors. In imposing the defendant's sentence, the trial court spoke at length and noted repeatedly the defendant's age, familial background, gang membership,

and lack of criminal history prior to this crime which the trial court referred to as heinous and a "nightmare." The trial court is not required to articulate each and every factor that it considers in rendering a sentence. However, that does not mean that it did not take all of the important and relevant factors into account. See *Jones*, 2019 IL App (1st) 170478, ¶ 54 (when mitigating factors have been presented to the trial court, it is presumed the court considered those factors, absent some indication to the contrary). Further, the trial court's careful contemplation of the defendant's sentence is highlighted by the fact that it *reconsidered* the original sentence of 50 years and then *reduced* the sentence to 40 years. The record before us negates the defendant's argument that the trial court did not take the relevant mitigating factors into consideration in determining his sentence. We accordingly find that the trial court did not abuse its discretion in sentencing the defendant and affirm his sentence of 40 years' imprisonment.

¶ 75                                CONCLUSION

¶ 76    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 77    Affirmed.

No. 1-17-1512

| | |
|---|---|
| **Cite as:** | *People v. Villalobos*, 2020 IL App (1st) 171512 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-1631(04); the Hon. James B. Linn, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Christopher Kopacz, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |