2022 IL App (1st) 201177-U

THIRD DIVISION
February 2, 2022

No. 1-20-1177

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 25404-01 |
| | ) | |
| MELVIN HARVEY, | ) | Honorable |
| | ) | Carol M. Howard |
| Defendant-Appellant. | ) | Judges Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in imposing an aggregate 40-year sentence for first-degree murder and armed robbery convictions committed when defendant was 16 years old. The record belied defendant's claims that the court failed to consider certain factors in sentencing.

¶ 2    Following a jury trial, defendant, Melvin Harvey, was convicted of the September 13, 1999, first-degree murder and armed robbery of the victim, Michael Harris. Defendant, who was 16 years old at the time of the offense, and was subject to an automatic transfer to adult court,

received concurrent respective terms of 52 years' and 30 years' imprisonment. In a prior appeal, this court concluded that defendant's 52-year sentence constituted a *de facto* life sentence pursuant to the supreme court's recent decision in *People v. Buffer*, 2019 IL 122327, and that the court had failed to consider the defendant's youth and its attendant characteristics in imposing that sentence. As a result, this court remanded for a new sentencing hearing. After a new sentencing hearing was conducted on remand, the court resentenced defendant to consecutive sentences of 28 years' imprisonment for first-degree murder and 12 years' imprisonment for armed robbery. In this appeal, defendant argues that the trial court abused its discretion in resentencing him to an aggregate 40-year sentence.

¶ 3     The record shows that defendant and co-defendant Stephen Croom were each charged by indictment with first-degree murder and armed robbery, and were tried in separate but simultaneous jury trials.

¶ 4     At trial, Dorothy Fauntleroy testified that she had known defendant, Croom, and Freddie Doyle basically "all [her] life." In the afternoon of September 13, 1999, Fauntleroy, defendant, and Doyle were walking toward a convenience store, and then back toward Fauntleroy's home. As they neared Fauntleroy's home, the victim, Michael Harris, whom Fauntleroy had met the previous day, arrived in a grey vehicle. Fauntleroy testified that she and the victim planned to go on a date, and Fauntleroy got into the victim's vehicle where they began discussing where they were going. The victim then pulled out a large sum of money, and Fauntleroy noticed that he had "hundreds, fifties and twenties." Fauntleroy and the victim agreed to go shopping, and Fauntleroy exited the vehicle to retrieve her keys from her home. The victim also exited the vehicle and asked Fauntleroy where he could get some marijuana. Fauntleroy saw defendant, Doyle, and Croom standing nearby, and she told Croom, whom she knew to sell marijuana, that the victim wanted to buy some from

him. Fauntleroy continued to walk into her house, and when she looked back, she saw Croom get into the front seat of the victim's car and defendant get into the backseat. When she was inside her home, she heard the car make a screeching noise. Fauntleroy went back outside, and no longer saw defendant, Croom, the victim, or his vehicle. Fauntleroy waited outside and then saw an ambulance and police cars drive past her house. She then walked toward the convenience store and saw the victim's car.

¶ 5    Denise Rhodes testified that on September 13, 1999, between 12:30 and 12:55 p.m., she was the passenger in a car when she noticed the car directly in front of her driving slowly. She could see a driver, a passenger in the front seat, and a passenger in the backseat. Rhodes saw the back passenger door open, and someone stuck their leg out of the car. The person pulled their leg back inside the car and the door closed again. The car slowed down even more, and she heard a single gunshot. Rhodes observed both doors on the passenger side of the car open, and two young men stepped out of the car and ran away. The back passenger was wearing a shiny red jacket and Rhodes saw him stuff something into his waistline. The front passenger was wearing a blue jacket.

¶ 6    Rhodes noticed the victim in the driver's seat slumped over. The car crashed through a yard, knocked over a fence, and finally came to a stop when it hit a wrought iron fence. Rhodes' friend continued to drive northbound to 130th Street and Indiana Avenue where Rhodes was able to flag down a Metra Police Officer and tell the officer that she believed someone had been shot. When she arrived back at the crash scene, she saw a lot of blood. The victim got out of the car and eventually fell to the ground and struck his head.

¶ 7    Chicago Police Officer Donald Fanelli testified that he responded to a call of a person shot at 133rd Street and Indiana Avenue. When he arrived on scene, he observed the victim standing next to his car, bleeding profusely from his head. Officer Fanelli did not see any U.S. currency,

drugs, or guns in the vehicle. Officer Fanelli received information from the dispatcher that the possible offenders were two black male teenagers, five foot three inches to five foot seven inches tall, wearing a red jacket and a blue jacket. Officer Fanelli testified that he had seen defendant five to ten minutes before the shooting, standing on the corner at 13355 South Indiana wearing a red jacket. Officer Fanelli had known both defendant and Croom for over a year at that time.

¶ 8     Cook County Deputy Medical Examiner Aldo Fusaro testified that he performed an autopsy on the victim's body. The victim had a gunshot wound on the right side of his head, and the wound was consistent with being shot from the right side and downward from three to four feet. Dr. Fusaro identified the cause of death as a gunshot wound, and the manner of death was homicide.

¶ 9     Chicago Police Officer Clifton Martin assisted in the follow-up investigation by attempting to locate defendant and Croom. Officer Martin was familiar with defendant and Croom from living in the area his entire life. On October 8, 1999, Officer Martin received a call from Croom who arranged to turn himself in. Croom and Officer Martin met on October 10, 1999, and Officer Martin patted Croom down, placed him into the squad car, and transported him to the police station.

¶ 10    Assistant State's Attorney Jeff Levine testified that on October 15, 1999, at approximately 4:30 p.m., he went with two detectives to the Champaign County jail to meet with defendant, who was being held on unrelated charges. After advising defendant of his *Miranda* rights, defendant gave a videotaped statement which was admitted into evidence and published for the jury.

¶ 11    In his videotaped statement, defendant said that on September 13, 1999, around 12:55 p.m., he was wearing a red satin jacket and blue jeans. Defendant was walking down 134th Street with Fauntleroy, when the victim pulled up in a car and called out to Fauntleroy. Defendant said that

Fauntleroy spoke to the victim for 10 to 15 minutes. When Fauntleroy returned, she told him that the victim had a large sum of money. Defendant asked Fauntleroy if he could rob the victim, and she told him that she "d[id]n't care." At that point Croom walked up, defendant asked Croom if he wanted to rob the victim, and Croom agreed. Defendant asked Croom for a gun, and Croom gave defendant a black .380 or 9 millimeter automatic handgun. Defendant stated that he put the gun in his right pocket. Fauntleroy then went back to the victim's car but she did not get inside. Instead, she asked defendant and Croom if they had any "weed." Defendant told her that they did, and he and Croom got into the victim's car. Defendant entered the rear passenger seat of the victim's vehicle and Croom got into the front passenger seat. Defendant stated that Croom showed the victim a bag containing approximately 3.2 grams of marijuana. The victim asked if they had any more, but changed his mind when Croom said that he would have to go inside his house to get it. At that point, defendant said that he pulled out the gun, pointed it at the back of the victim's head, and told the victim to give them his money. Croom told the victim to drive. Croom attempted to go through the victim's pockets, but the victim kept pushing Croom's hand away. Defendant stated that the victim then started "driving crazy" and swerving, so defendant took the safety off the gun, and put the gun to the victim's head again. Croom then punched the victim in the mouth, and the victim began to drive even crazier and locked the doors so defendant and Croom were unable to exit. Defendant said that he was eventually able to get the door open, and when he stepped out of the car, he pulled the trigger of the gun which was still aiming toward the victim. Defendant said that blood flew everywhere. Defendant said that as he pulled the trigger, he was thinking that the police were going to be coming. Defendant jumped out of the car and he and Croom ran three blocks to their friend's house. As defendant ran, he wiped the gun with his shirt to try to remove his fingerprints. Defendant gave the gun to Croom, and went to Michigan City to stay the night.

¶ 12    The parties stipulated that Sheila Ivory, a security guard at Hermitage Community Bank, would testify that the victim cashed a check for $1200 on September 13, 1999, at 12:47 p.m. The parties also stipulated that Dennis Martus, a Chicago Fire Department Paramedic, would testify that he was working on September 13, 1999, and received an assignment to go to 133rd and Indiana, the location of the victim's car. Martus searched the victim's pants for identification and did not find any money on his person or in his clothing. The parties also stipulated that Gregory Janicki, a forensic analyst with the Chicago Police Department, would testify that he processed the crime scene at 13256 South Indiana on September 13, 1999. He did not recover any U.S. currency in the victim's vehicle but he did recover six fingerprints from the vehicle. Finally, the parties stipulated that Cari Sandberg, a forensic scientist at the Illinois State Police crime lab, would testify as an expert in the field of fingerprint analysis. Sandberg received two inked palm print cards for defendant and two palm print cards for Croom and compared them to the six fingerprints recovered by Officer Janicki. The comparison "did not reveal any identifications."

¶ 13    After the State rested, defendant testified on his own behalf. Defendant's testimony was largely consistent with his videotaped statement. Defendant testified that he intended to rob the victim, that he never intended to "use" the gun, and that he just wanted to scare the victim during the robbery. Defendant also explained that he pulled the gun out when the victim said he was taking them to the police, claiming that he only intended to scare the victim into stopping the car, and he did not intend on shooting. Defendant testified that as they approached 133rd Street, the vehicle stopped, and he got halfway out of the car. At that point, the victim was trying to "tussle" for the gun and it "went off." Defendant acknowledged that he said that he pulled the trigger in his video statement, but he explained that he meant that the gun went off by accident.

¶ 14    The jury found defendant guilty of armed robbery and first-degree murder. At sentencing, the State introduced a victim impact statement from the victim's brother and defendant's juvenile delinquency history in aggravation. The trial court sentenced defendant to concurrent sentences of 52 years' imprisonment for first-degree murder and 30 years' imprisonment for armed robbery.

¶ 15    On direct appeal, this court affirmed defendant's convictions and sentence over his claims that he was denied effective assistance of counsel where trial counsel did not submit the State's case to any meaningful adversarial testing, and that his 52-year sentence for first-degree murder should be reduced because he was only 16 years old at the time of the offense.

¶ 16    Defendant filed a *pro se* postconviction petition on April 19, 2005, arguing that he received ineffective assistance of counsel and that his 52-year sentence was excessive. On July 6, 2005, the trial court summarily dismissed defendant's petition as barred by *res judicata*. On appeal from that dismissal, this court allowed defendant's appellate counsel to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the dismissal of defendant's postconviction petition.

¶ 17    On August 12, 2015, defendant filed a *pro se* motion seeking leave to file a successive postconviction petition. In his successive *pro se* petition, defendant claimed that his 52-year sentence for the first-degree murder he committed when he was 16 years old violated the United States and Illinois Constitutions. His motion alleged that the cause for his failure to include this issue in his original petition was that the decisions in *Miller v. Alabama*, 467 U. S. 460 (2012), and *People v. Davis*, 2014 IL 115595, were decided after he had filed his initial postconviction petition. His motion also alleged that he was prejudiced by not having the opportunity to present mitigating evidence and for not having the sentencing court take his age into account. The trial court denied leave to file the successive petition finding that defendant failed to meet the prejudice prong of the

cause and prejudice test, because *Miller* "applie[d] only to *mandatory* life sentences." (Emphasis in original).

¶ 18    On May 16, 2019, this court found that defendant's 52-year sentence was a *de facto* life sentence under *People v. Buffer*, 2019 IL 122327, and that the trial court failed to consider defendant's youth and its attendant characteristics in imposing that sentence. *People v. Harvey*, 2019 IL App (1st) 153581, ¶¶ 10-11. Accordingly, this court reversed the judgment of the trial court and remanded defendant's case for resentencing in accordance with *Buffer*, 2019 IL 122327 and 730 ILCS 5/5-4. 5-105 (West 2018). *Harvey*, 2019 IL App (1st) 153581, ¶¶ 14-15.

¶ 19    The trial court held a resentencing hearing on remand in October 2020. The trial court noted it had reviewed defendant's updated presentence investigation report, and both parties submitted sentencing memoranda.

¶ 20    The State presented testimony from Wayne Harris—the victim's brother, and Yolanda Harris—the victim's daughter, who each read victim impact statements into evidence. The State also detailed defendant's prior juvenile delinquency history, which included residential burglary, possession of a stolen motor vehicle, attempted auto theft, and robbery.

¶ 21    Defendant called Dr. Robert Hanlon, a professor of psychiatry and neurology at Northwestern University, as an expert in the field of forensic neuropsychology with experience in evaluating individuals with cognitive disabilities. Dr. Hanlon had conducted an evaluation of defendant, who was 37 years old at the time of the evaluation. Dr. Hanlon found that defendant's intelligence was in the low average range at the time of his evaluation, which was likely representative of his intelligence at least through late adolescence into adulthood, and that he had no signs of mental illness. Dr. Hanlon testified that, at 16 years old, defendant would have had significant neurological changes occurring in his brain which could have influenced his behavior.

8

Dr. Hanlon testified that he was able to find out the circumstances surrounding the offense in this case by reviewing police reports and accounts provided by defendant and Croom, as well as interviewing defendant about his recollections. Dr. Hanlon opined that it was likely that outside pressure contributed to defendant's conduct in this case. Dr. Hanlon testified that defendant expressed remorse for his actions, and Dr. Hanlon believed that defendant had the potential for rehabilitation.

¶ 22    On cross-examination, Dr. Hanlon conceded that his report did not include a clinical opinion that defendant was rehabilitated. Dr. Hanlon also had not spoken to defendant's family, performed any brain scans on defendant, or administered any tests to defendant when he was 16 years old. Dr. Hanlon also conceded that he did not review transcripts of the trial, including defendant's testimony or his videotaped confession.

¶ 23    The State argued that, based on the *Miller* factors, defendant should be sentenced to the maximum allowable sentence. If the trial court determined the sentence must be 40 years or less, the State requested that defendant be sentenced to 34 years for first-degree murder and 6 years for armed robbery, to be served consecutively, further noting that the first-degree murder sentence would be served at 100%, and the armed robbery sentence would be served at 85%. Defense counsel also discussed the *Miller* factors and argued that defendant should receive the minimum sentence of 20 years, further asking the trial court to have the sentences run concurrently.

¶ 24    Defendant made a statement in allocution in which he apologized to Harris's family for his actions, although he remarked in referring to Harris, that he "[didn't] want to use the word victim."

¶ 25    In its ruling, the trial court considered the underlying crime, describing it as a "tragedy and needless crime." The court observed that it was "bad enough" that defendant decided to rob the victim, but "there was simply no reason whatsoever to kill him." The court also considered

9

defendant's juvenile history in aggravation, noting that it was not defendant's "first brush with the law."

¶ 26    The court then meticulously considered the *Miller* factors. See *Miller*, 567 U.S. at 477-78 (instructing that courts should consider the following factors in juvenile sentencing: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation).

¶ 27    First, the trial court observed that defendant was 16 years old at the time of the murder, just "ten days shy of his 17th birthday." The trial court noted that defendant "had trouble with [his] family environment," that defendant's male role model, his father, had been killed, and defendant "did not have the means to deal with" his death. Regarding defendant's degree of participation in the crime, the trial court referred to evidence of "peer pressure," acknowledging that defendant was the youngest person involved in the incident, but also observed that defendant was the shooter. Regarding defendant's competence and his ability to deal with police officers or prosecutors, and his ability to assist his attorney, the court found that defendant was able to communicate with his attorney and that he had competent counsel, further observing that the evidence was "unclear" regarding his ability to deal with police or prosecutors.

¶ 28    The trial court then considered defendant's potential for rehabilitation. The court addressed the disciplinary tickets he had received while incarcerated, noting that it "appeared [that defendant]

10

got an average of one ticket or got into one disciplinary incident a year on average." The court described this as "not *** a sterling record," but also "certainly not the wors[t] record [the court had] encountered in these types of cases." The court further noted that defendant had worked while incarcerated, attended classes, and had family support including a job offer upon release. The trial court concluded that the State "ha[d] not established that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corr[up]tion beyond the possibility of rehabilitation. This Court finds [the] opposite. This Court does believe that he can be rehabilitated."

¶ 29    Based on all of the above, the trial court sentenced defendant to 28 years' imprisonment for first-degree murder and 12 years' imprisonment for armed robbery, to run consecutively, for a combined sentence of 40 years' imprisonment. Defendant moved for reconsideration of that sentence, and the trial court denied the motion, explicitly stating that it had "considered all the evidence submitted" at the sentencing hearing, and that it had considered that evidence "in accordance with the statute set forth in both *Miller* and *Buffer*." Defendant filed a timely notice of appeal.

¶ 30    In this appeal, defendant contends that the trial court abused its discretion in sentencing him to an aggregate 40-year sentence. Defendant does not explicitly claim that his sentence was excessive, but argues that the court failed to adequately consider certain factors in sentencing. Specifically, defendant faults the trial court for failing to "properly consider the defendant's ability to consider risks and consequences, the defendant's lower than average intelligence, the defendant's ability to interact with the police and prosecutors, and *** the defendant's rehabilitation." Defendant acknowledges that the trial court "considered the defendant's age at the time of the offense," but contends that the court failed to say anything "as to [his] 'impetuosity,

11

and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability.' "

¶ 31     The circuit court has broad discretionary powers in imposing a sentence, and its sentencing decision is entitled to "great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This deference is based upon the fact that the circuit court is in a better position to consider the relevant sentencing factors in both aggravation and mitigation. *Id.* As a result, we may not substitute our judgment for that of the circuit court merely because we would have weighed these factors differently. *Id.* We will not alter a defendant's sentence absent an abuse of discretion. *Id.* "Our supreme court has found that, with respect to a sentence, an abuse of discretion occurs when the sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense." *Id.* A sentencing decision that falls within the statutory range is presumptively proper and will not be disturbed absent an abuse of discretion. *People v. Bridges*, 2020 IL App (1st) 170129, ¶ 37; *People v. Fern*, 189 Ill. 2d 48, 54 (1999) ("A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.") (citing *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987)).

¶ 32     We note that in the instant case, the court considered the factors as outlined in *Miller* and adopted in 730 ILCS 5/5-4.5-105(a) (West 2018), and found that the State had not "established that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corr[up]tion beyond the possibility of rehabilitation." Accordingly, the court declined to sentence defendant to a *de facto* life sentence. Instead, the court resentenced defendant to 28 years' for first degree murder and 12 years' for armed robbery, for an aggregate 40-year term of imprisonment. Defendant did not receive, nor does he argue that he received, a *de facto* life

sentence. See *People v. Buffer*, 2019 IL 122327, ¶ 41 (establishing that a sentence of 40 years or less imposed on a juvenile defendant is not a *de facto* life sentence). Having found no irretrievable depravity, permanent incorrigibility, or irreparable corruption, the available aggregate sentencing range for defendant was between 26 and 40 years' imprisonment (see 730 ILCS 5/5–4.5–20(a) (West 1998) (establishing a minimum sentence of 20 years' imprisonment for first-degree murder); 730 ILCS 5/5-4.5-25 (West 1998) (establishing a minimum sentence of 6 years' imprisonment for armed robbery, a Class X felony); 730 ILCS 5/5-8-4(d)(1) (West 1998) (mandating mandatory consecutive terms where one of the offenses for which the defendant is convicted is first-degree murder). Defendant's sentence falls within the applicable sentencing range and therefore is presumed to be proper. *Bridges*, 2020 IL App (1st) 170129, ¶ 37; *Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 33    Because defendant was 16 years old at the time of the offense, and was resentenced in 2020, the trial court was required to consider additional factors in mitigation pursuant to 730 ILCS 5/5-4.5-105(a) (West 2018). These factors include:

> "(1) defendant's age, impetuosity, and level of maturity at the time of the offense;
>
> (2) whether defendant was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) defendant's family, home environment, educational and social background;
>
> (4) defendant's rehabilitation potential;
>
> (5) the circumstances of the offense;
>
> (6) defendant's degree of participation and specific role in the offense;
>
> (7) whether defendant was able to meaningfully participate in his defense;
>
> (8) defendant's prior juvenile or criminal history; and
>
> (9) any other information the court finds relevant and reliable."

730 ILCS 5/5-4.5-105(a) (West 2018).

¶ 34    With respect to factors in mitigation, we presume the circuit court properly considered all relevant mitigating factors presented, absent some indication to the contrary other than the sentence itself. See *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21; *People v. Madura*, 257 Ill. App. 3d 735, 740 (1994). The trial court is not required to articulate each and every factor that it considers in rendering a sentence (*People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74), nor is it required to assign a value to every mitigating factor upon which it relies (*People v. Madura*, 257 Ill. App. 3d 735, 740-41 (1994)). "The fact that a court expressly mentions a factor in mitigation does not mean the court ignored other factors." *People v. Burton*, 184 Ill. 2d 1, 34 (1998) (citing *People v. Burrows*, 148 Ill. 2d 196, 254-56 (1992)). We review whether the court failed to consider evidence in mitigation for an abuse of discretion. See *People v. Burnette*, 325 Ill. App. 3d 792, 807-09 (2001); *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992).

¶ 35    Defendant's argument that the court failed to consider certain factors in mitigation is without merit. The court expressly went through the above factors, and considered defendant's youth and its attendant characteristics. The trial court is not required to articulate each and every factor that it considers in rendering a sentence. *Villalobos*, 2020 IL App (1st) 171512, ¶ 74. There is no evidence to contradict the presumption that the trial court considered all relevant factors in determining defendant's sentence. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 36    Moreover, "where mitigation evidence is before the court, it is presumed the court considered that evidence absent some contrary indication other than the sentence imposed." *Andrews*, 2013 IL App (1st) 121623, ¶ 18. Here, as discussed above, evidence regarding all of the mitigating factors was presented to the trial court, including in the presentence investigation report and Dr. Hanlon's report and testimony. The trial court specifically indicated that it had considered

all of the evidence, the facts of the trial, defendant's background, and the *Miller* factors in crafting defendant's sentence. Additionally, in denying defendant's motion to reconsider his sentence, the trial court noted that it "considered all the evidence submitted pursuant to the sentencing hearing," and "considered it in accordance with the statute set forth in both *Miller* and *Buffer*." Defendant points to nothing other than the sentence imposed upon him as indicative that the mitigating factors were not considered by the trial court, which is insufficient for this court to find an abuse of discretion. *Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21.

¶ 37     Finally, defendant argues that the court failed to consider certain aspects of defendant's rehabilitative potential. However, the trial court specifically found that defendant was not beyond the possibility of rehabilitation and, accordingly, did not impose a *de facto* life sentence. The trial court explicitly stated that it had considered the letters in support of defendant and the potential job offer upon his release, his work while incarcerated, the services he took advantage of, and his certificates for classes he took in reading, math, and parenting. The trial court did not find that "defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corr[up]tion beyond the possibility of rehabilitation." Accordingly, the trial court departed from defendant's original sentence of 52 years, declined to impose the 25-year firearm enhancement (See 730 ILCS 5/5-4. 5-105(b) (the court "may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession")), and imposed a decreased, aggregate 40-year sentence (12 years of which may entitle defendant to sentencing credit.).

¶ 38     While acknowledging that there is "no specific information *** as to the defendant's interaction with police and prosecution," defendant also argues that the sentencing court failed to generally consider "issues related to police interrogations of juveniles." Defendant cites a series of cases related to police interrogation of juvenile defendants. Defendant, however, did not raise any

such issue to the trial court, and there has been no evidence in this case that would show that defendant's confession was the result of coercion or undue influence.

¶ 39    For the foregoing reasons, we find no abuse of discretion in defendant's aggregate 40-year sentence for first-degree murder and armed robbery, and we affirm the judgment of the circuit court of Cook County.

¶ 40    Affirmed.