2022 IL App (1st) 172823-U

THIRD DIVISION
March 9, 2022

No. 1-17-2823

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13CR19440 |
| | ) | |
| | ) | Honorable |
| CHRISTOPHER WEST, | ) | Erica L. Reddick |
| | ) | Judge Presiding |
| Defendant-Appellant. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1 *Held*: Affirmed. Court properly admitted defendant's recorded statement directly admitting to murder, despite reference to other-crimes evidence within admission. Any error in omitting other references to other crimes or acts was harmless. Defendant's sentence is not excessive nor unconstitutional because court adequately considered his youth and its attendant characteristics, and counsel was not ineffective for failing to present additional mitigation.

¶ 2 Two days after Christmas in 2008, two men shot and killed Anthony Curtis near Indiana Avenue and 49th Street in Chicago. The case went cold until 2012, when an investigator with the Illinois Department of Corrections learned that an inmate, Christopher West (defendant here), had purportedly bragged to another inmate that he shot Curtis.

¶ 3 A few months later, defendant told a similar story to Maurice Montgomery while they

were incarcerated together at Pickneyville Correctional Center. Unbeknownst to defendant, however, Montgomery wasn't the only one listening; Montgomery had agreed to wear a wire to record their conversation. Defendant detailed to Montgomery how he and another man killed Curtis.

¶ 4    Based mostly on the recorded confession, the State charged defendant with murder. The jurors deciding defendant's fate heard more than an hour of his recorded confession and convicted him. The court later sentenced defendant to a total of 40 years in prison, electing to apply a 20-year discretionary firearm enhancement, even though defendant was 17 years old at the time of the murder.

¶ 5    Now on appeal, defendant challenges some of the recorded statements, arguing that they were prejudicial other-crimes evidence improperly used to prove he was a bad person. He also argues that his sentence must be reduced or set aside. While we do find some error in the admission of other-acts evidence, we find no basis to overturn the verdict on that ground. Nor do we find any error in sentencing.  We thus affirm the conviction and sentence.

¶ 6                         BACKGROUND

¶ 7     On the afternoon of December 28, 2008, Anthony Curtis was standing outside at Indiana Avenue and 48th Street in south Chicago. Kerara Davis was nearby, sitting in her car near 49th and Indiana, when she heard some gunshots and saw men running away from her. She also saw a man lying on the ground. That man was Curtis, who was dead after being shot twice. Meanwhile, Ida Finch was cooking in her kitchen in the 4900 block of South Indiana when she heard some gunshots, followed by the sound of a slamming gate at the back of her building. She went to the front window, looked out, and saw someone in a dark hoodie sweatshirt and jeans

walking toward Indiana. Finch did not know defendant and could not identify him as the man she saw, but she later learned his family lived in an apartment next to hers.

¶ 8 Chicago police detective Frank Casale responded to the scene at 48th and Indiana, where forensic investigators recovered three bullet shell casings. One of the casings was .40 caliber, while the other two were 9-millimeter, leading Casale to conclude that two shooters killed Curtis. Michael Humilier, a medical examiner, later autopsied Curtis's body and found he had been shot multiple times, including once beneath the top of his head. That shot, he said, was fired at close range. Curtis died from the wounds.

¶ 9 As part of the investigation, Casale learned that Curtis was a member of the Outlaw faction of the Gangster Disciples gang, and that the Outlaw faction was involved in an ongoing dispute with the nearby MOB faction. With this information, Casale assembled a photo array, including a photo of defendant, to show to Finch. However, she could not identify anyone in it. Police also interviewed various members of both gang factions and arrested defendant as a "person of interest" about a month after the murder. He was cooperative with investigators, Casale said, and they released him without charging him a few days later. Police also recovered two guns in an unrelated investigation, and forensic testing later determined that one of them fired the 9-millimeter casings police recovered from the scene of Curtis's murder. Casale also interviewed Sterlyn Woods and Wayne Guy, both of whom were incarcerated. Despite their work, police could not develop the case any further, and it went cold.

¶ 10 It warmed up a few years later. In 2012, Major Brian Kuder, a member of the Illinois Department of Corrections Intelligence Unit, learned that an inmate at the Vienna Correctional Center, Willie Mance, had information about a homicide in Chicago that involved defendant, who was in prison for an unrelated case. Kuder contacted Casale, and they discussed cooperating

with Mance to learn what he knew. Mance was told not to tell anyone that he might cooperate with investigators, but he couldn't keep quiet. When IDOC officials learned that Mance had told a correctional officer about the investigation, they transferred him to Menard Correctional Center. However, Kuder arranged for defendant to move to Pickneyville Correctional Center and be housed with Maurice Montgomery, an inmate who had previously cooperated with investigators.

¶ 11     Meanwhile, Casale and others went to Menard to speak with Mance. There, Mance prepared a written statement that claimed he met defendant while they were incarcerated at Vienna together. According to Mance, defendant confessed that he and a friend killed a man in Chicago, nicknamed "Nut" or "Black," using .40 and .45 caliber guns. Mance later told a grand jury that the defendant told him that, on the day of the shooting, he learned that the "guy who had killed his cousin" was by his mother's house. Defendant's mother lived at 49th and Indiana, and defendant and another man went to the area wearing hoodies and armed. As they approached the victim, defendant saw them but froze. Defendant said he then walked up to the victim and shot him in the head before his gun jammed. The defendant told Mance that, as he was leaving the scene, he saw an old woman looking out of a nearby window and another woman going up some stairs. He pointed his gun at the woman on the stairwell and tried to shoot, but it jammed and did not fire. At defendant's trial, Mance denied speaking to investigators or the grand jury.

¶ 12     On September 7, 2012, Casale and his partner went to Pickneyville to speak to Montgomery. At the time, Montgomery was serving a 28-year prison sentence for armed robbery. About a month later, Montgomery consented to help police record his conversation with defendant by wearing a concealed microphone or wire. On October 18, 2012, police used the wire to record a conversation between Montgomery and defendant.

¶ 13 That day, Casale planned to interview defendant about Curtis's murder at Pickneyville, while another investigator placed the recording wire on Montgomery's body. Casale hoped that, after interviewing defendant, he would return to the prison cell and speak about the case to Montgomery. Then, using information Montgomery learned in his previous conversations with defendant, the two men would discuss the murder on tape. All went according to plan, and when defendant returned after Casale interviewed him, he and Montgomery began to talk about the murder investigation.

¶ 14 On the recording, defendant admitted killing Curtis and discussed the specifics of the murder. He said that he killed Curtis on December 27, 2008, while wearing a black hoodie. On that day, he said, Woods called him and told him he saw Curtis near his mother's place at 49th and Indiana. Woods then asked defendant to "take care of it." The defendant said Curtis was selling drugs when he was shot, and when defendant and his partner, someone named Lee, approached him, Curtis did not run. They shot him twice in the head with different guns, defendant said on the recording, and Curtis died instantly. Defendant told Montgomery both guns jammed after firing the fatal shots into Curtis, but that if his gun had not jammed, defendant would have killed the witnesses to the murder as well. When they left the scene, defendant said they threw their guns into the river, then went to see a movie with some women and went back home. Defendant also opined that he believed Woods was cooperating with the police now because defendant was planning to kill Woods, and Woods knew it.

¶ 15 After their conversation, Montgomery pretended that he needed medical attention and left the prison cell where defendant and he were together. When he did, police removed the recording device from his body.

¶ 16    In September 2013, Casale arrested defendant, and the State charged him with first-degree murder. Before trial, defendant moved to redact some parts of the recording, arguing that they were improper because they referenced other crimes, including defendant's desire to kill any witness who could testify against him about the murder (including Woods). The court denied the motion except for one statement where defendant claimed Curtis was not the first person he had killed.

¶ 17    At defendant's jury trial, Davis, the woman in the car, and Finch, the neighbor, both testified. Casale also detailed his investigation. Montgomery testified as well, and he explained his agreement with police to record his conversation with the defendant. Montgomery said that, at age 42, he had earned some respect in prison and was someone to whom defendant looked up. Montgomery also admitted it was good for younger inmates to have a reputation as a shooter. Montgomery said he did not receive anything in exchange for cooperating with police, although he had asked for consideration from the State's Attorney's Office. The office denied him any, however.

¶ 18    Defendant did not testify, and after four hours of deliberation, the jury found him guilty of first-degree murder. The jury also found that he personally discharged a firearm during the crime.

¶ 19    Prior to sentencing, defendant filed a sentencing memorandum and exhibits, arguing the court should consider his age and outside influences in sentencing him. At the hearing, defendant's counsel highlighted his youth and suggested he participated in the murder under peer pressure, seeking to prove himself to others who were more responsible for Curtis's killing. The State, while acknowledging defendant was 17 years old, argued he was a "man" who knew what he was doing, and suggested his bravado on the recording indicated as much.

¶ 20    After the parties concluded their arguments, the court took a short recess to privately

consider what had been presented to it. When it returned, the court acknowledged defendant's

age, his upbringing, and that peer pressure likely motivated him to shoot and kill Curtis. But the

court also recognized the serious nature of the case, and that the defendant had threatened to kill

the witnesses to his crime. With that in mind, it elected to enforce the 20-year firearm

enhancement but sentenced defendant to the minimum time allowable, a total of 40 years. We

will discuss his sentencing hearing more below when addressing defendant's challenge to it.

¶ 21                                ANALYSIS

¶ 22    Defendant first claims the court erred when it refused to redact portions of his

recorded statement. These statements suggested that defendant considered killing or sought to

kill eyewitnesses to his killing of Curtis. In another statement, defendant bragged that his murder

of Curtis was "most gangsterest murder" he ever committed. These statements were highly

prejudicial propensity evidence, he argues. Second, defendant attacks his sentence, based mostly

on his young age, alleging the court did not adequately consider his youth and its attendant

circumstances.

¶ 23                        I. Admission of defendant's statements

¶ 24    The State's most compelling evidence against defendant was his own words,

gratuitously confessing to shooting Curtis. The jury heard more than an hour of defendant

speaking with Montgomery in his prison cell, discussing the murder and his role in it.

Unsurprisingly, defendant (unaware he was being recorded) said a lot, discussing what went

through his mind before and after killing Curtis, wondering aloud why police were interviewing

him now, and at times, hyping up his actions and bragging about how many more people he

would have killed had his gun not jammed. While many of those statements narrated the murder

itself, some drifted to other topics, including if there were other witnesses who knew what happened and whether he wanted to harm them.

¶ 25    Before us, he claims that some of these tangential statements were improperly admitted, as they constituted evidence of other crimes defendant had committed or had considered committing. He claims the only relevance of these statements is to show his propensity to commit crimes—especially murder, the charge he faced here.

¶ 26    We review these evidentiary rulings for an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. The court abuses its discretion when no reasonable person would agree with its ruling. *Id*.

¶ 27    Generally, evidence that a defendant has engaged in other bad acts or crimes is not admissible to prove the defendant has a propensity to commit crime. Ill. R. Evid. 404(a) (eff. Jan 1, 2011); *Pikes*, 2013 IL 115171, ¶ 13. Such evidence is dangerous not because it has no probative value, "but rather because it has too much." *People v. Manning*, 182 Ill. 2d 193, 213 (1998). The law recognizes the human reaction to think that, if the defendant committed one crime, it's more likely that he committed the crime for which he is currently charged. *See People v. Clark*, 2015 IL App (1st) 131678, ¶ 27. Because this inference is so enticing and can overshadow the jury's consideration of other evidence in the case, the law generally forbids the use of other-crimes evidence to prove a defendant's propensity. *Manning*, 182 Ill. 2d at 214.

¶ 28    But there is no blanket ban on other-crimes evidence; "[s]uch evidence may *** be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan 1, 2011). That list of reasons is not exhaustive; other-acts evidence is admissible "if it is relevant for any purpose other than to show the propensity to commit crime." *People v. Illgen*, 145 Ill. 2d 353,

364-65 (1991); see *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991) (other-crimes evidence is admissible if relevant to any material question besides propensity). When such evidence is offered, the trial judge must weigh its probative value against its prejudicial effect. *Thingvold*, 145 Ill. 2d at 452; Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 29                                    A. Defendant's reference to "murder"

¶ 30        We first consider defendant's recorded statement that he considered his shooting of Curtis to be "the most gangsterest [*sic*] murder I ever did." Defendant makes the obvious point that contained within this admission is another admission—to committing other murders, thus constituting prejudicial other-crimes evidence. Defendant also notes that he made numerous admissions to killing Curtis throughout the recorded statement, so this one was cumulative and unnecessary, thus diminishing its probative value.

¶ 31        The State argues that this statement was the most direct admission to the murder that defendant made. The State also made the point below that it would be impossible to excise the other-crimes part of the statement without reducing the remainder of the statement to "meaningless gibberish."

¶ 32        The trial court considered it a "difficult[]" question, given that the other-crimes evidence was wrapped within defendant's admission to killing Curtis, also noting that, "[o]n the other hand, if this is the most critical direct evidence that the State has of his admission to actually committing the offenses, it really—I mean, the trial certainly has to be fair and ensure that Mr. West—his constitutional rights to a fair proceeding are being protected. This cannot be done at the behest of gutting the State's case of its key evidence at the same time." Ultimately, the court admitted that portion of the recorded statement.

¶ 33        The State relied below on *People v. Stevenson*, 198 Ill. App. 3d 376, 384–85 (1990),

where a police officer testified that the defendant, charged with attempted murder, admitted that "I stuck the m-----f-----. I'm going to jail. I've been there five times and I'm going again." We found no abuse of discretion in admitting this reference to other crimes, as the testimony was an admission that served as an exception to the rule against other-crimes evidence.

¶ 34    More to the point, in our view, is a decision on which *Stevenson* relied. In *People v. Williams*, 151 Ill. App. 3d 1010, 1013 (1987), an arresting officer testified that soon after defendant's arrest for retail theft, the defendant told him that his arrest " 'would be his second theft.' " Despite the fact that this statement reflected a prior crime, this court upheld the admissibility of this statement, as it likewise "constitute[d] an admission, from which it was possible to infer a consciousness of guilt." *Id.*

¶ 35    The defendant's admission in *Williams* is much like the admission here, where the other-crimes reference is so interwoven with the defendant's relevant admission to committing the crime charged that it would be impossible to excise the irrelevant from the relevant without reducing the statement to gibberish. Again, defendant said that his killing of Curtis was "the most gangsterest murder I ever did." The words "most gangsterest," as well as the words "I ever did," both imply that defendant had committed previous murders. Remove those words, and about the only word left is "murder," reducing a relevant admission by defendant to an unintelligible utterance.

¶ 36    As noted, however, defendant claims the tipping point in the balancing of probative value versus prejudicial impact lies in the fact that defendant made several other admissions to killing Curtis within his lengthy recorded statement, so this one was unnecessary. The State, while not disagreeing that defendant made many admissions throughout the recording, emphasizes that the one at issue here was the only place where defendant outright, literally

admitted to murder. Defendant cites the following exchanges in the recording as examples of where defendant admitted to shooting and killing Curtis:

"Defendant: [Sterlyn Woods] wasn't there matter fact. My homie the ni--a that did it with me and shit. S'pose [*sic*] to uh, he s'pose [*sic*] to told 'G' and shit. He s'pose [*sic*] to told the ni--a, but this the ni--a that called us. Remember I told you we were at Murrays.

***

Montgomery: After y'all got off the phone with him what happened?

Defendant: Shit, we moved out, did what we did.

***

Defendant: [Sterlyn Woods] was on his way to the block and he saw [Curtis]. He was not coming to the block. He saw him just standing there. *** Said I just drove past this ni--a, I seen this ni--a standing out here. Woo wop the bam.

Montgomery: Mmmkay so ya'll went took care of it.

Defendant: Yeah and it was over with.

***

Montgomery: Aye I could just imagine, yo I could just imagine . . . dude din't [*sic*] get a chance to scream, none of that?

Defendant: His dumb ass looked. He see that I'm coming and just, just say. I guess he was just ready to go his damn self man.

Montgomery: Aww he seen you all coming.

Defendant: Yeah he saw us walking over with the guns out black hoodies on. He standing there like juice.

Montgomery: Oh it's that type of party aye.

Defendant: I guess he was just ready to go. So they can't blame us. Ni--a was ready to go his damn self.

***

Montgomery: I'm talking about was y'all, y'all, he ain't get a chance, he ain't get a chance to do no declaration like mudhaf---a did on me. Y'all made sure.

Defendant: Positive.

Montgomery: Ok so, that rules that out.

Defendant: Dead instantly.

Montgomery: Aww domed him?

Defendant: Two (2 clicking noises).

Montgomery: Two to the head?

Defendant: Different guns. *** To make it so bad about it, both of our shit jam up at the same time. Both of our shit like after the first "bah" "bah" both of our shit were like this over in a minute f--- ***."

¶ 37     Defendant makes a valid point that these exchanges constituted examples of defendant admitting, in his own way, to the murder. The references to "we *** did what we did," to "woo wop the bam," to agreeing with Montgomery that he "went took care of it," that he gave Curtis no time to protest, that Curtis was "[d]ead instantly," the two clicking noises, and mentioning that both guns jammed up after the first shot, can be reasonably understood as defendant admitting to the murder and, indeed, can hardly be explained as anything else.

¶ 38     Still, each of these statements is somewhat coded or indirect, nowhere near as on-the-nose as defendant's statement that this murder was "the most gangsterest murder I ever did." Our standard of review is highly deferential; we will uphold the trial court's ruling unless no

reasonable person could agree with it. *Pikes*, 2013 IL 115171, ¶ 12. The trial court here took its time with this evidentiary question, initially reserving judgment before ultimately admitting the testimony because of its great relevance as the most direct admission of murder. One might call this ruling close, but by no means could we say that no reasonable person would agree with it. We thus find no abuse of discretion with this ruling.

¶ 39                              B. Other challenged statements preserved for appeal

¶ 40        We next consider the two other series of statements that defendant challenges and which were preserved for appeal. The first set concerns statements defendant made about his accomplice Sterlyn Woods, whom the police had told defendant was the source of information against defendant:

> "Defendant: I know [Sterlyn] was gone give me up anyway. I told you I got into it when I was finna kill him before on the block.
>
> ***
>
> Defendant: I told you I was just the only reason [Sterlyn] doing that cuz we ain't giving him no lawyer and then I was finna kill his ass on the block, right before he got locked up and then."

¶ 41        Defendant, of course, objects to the two statements in which he tells his cellmate that he was "finna kill" Sterlyn Woods. Everyone agrees that "finna kill" means "fitting to kill," or "planning to kill" in more common usage. The State does not dispute that those statements constitute other-acts or other-wrongs evidence, as they clearly indicate defendant's plan or desire to kill Sterlyn after Curtis's murder. We agree as well. So the admission of those statements must be justified for a purpose other than defendant's propensity to commit murder.

¶ 42        The State essentially adopts its arguments in the trial court as well as the trial court's

reasoning. It claims that "defendant's discussion of [Sterlyn] as someone with knowledge of Curtis' murder provides context for defendant's statements to Montgomery about Curtis's murder." It further cites the trial court's reasoning that these statements were "an acknowledgment that Woods was at least a witness to events that led to the charges in this case and properly permitted it to be admitted for that reason."

¶ 43      But there was never any doubt, as defendant recounted it in his lengthy recorded statements, that Sterlyn was a part of the murder of Curtis, at least insofar as Sterlyn told defendant where to find Curtis. Sterlyn was mentioned repeatedly in that regard. And even if that fact were in doubt, which it plainly was not, the statement that defendant knew Sterlyn was going to "give him up" would have sufficed, without adding—twice—that defendant had been planning to *kill* Sterlyn. We thus find that it was an abuse of discretion to admit the two references in the recording where defendant admitted that he had been planning to kill Sterlyn Woods.

¶ 44      We next consider similar evidence of statements made by defendant in which he told his cellmate that, had his gun not malfunctioned, he would have murdered any potential eyewitness, including a woman with a baby who witnessed the shooting:

"Defendant: My shit jammed up on him... Come on man every motherf---r that seen. I don't give a f--- who you is... I ain't playing with they ass ... That would've been a triple homicide.

Montgomery: [I]f a mother----r would've opened the door after you done did all that and then another mother----r came out the side from the gangway.

Defendant: It would've been a quadruple murder.

Montgomery: ...[J]ust after you done, you got rid of buddy, the bitch, the hype, say

for instance some mother----r would'a opened the door, hey uh—

Defendant: Bock (gun shot sound)

Montgomery: Another mother----r coming out the side of the gangway.

Defendant: Bock (gunshot sound) ... If I had enough bullets to kill them all, all they

asses would've been dead."

¶ 45    The State claims here that this evidence was necessary to give context to the shooting and explain the circumstances. To be sure, evidence of other crimes or acts may be admitted if the other crimes or acts are part of the continuing narrative giving rise to the offense or are intertwined with the event at issue. *People v. Hale*, 2012 IL App (1st) 103537, ¶ 14; *People v. Outlaw,* 388 Ill. App. 3d 1072, 1086–87 (2009). Other-acts evidence is likewise admissible to explain an aspect of the crime charged that would otherwise be implausible, or where the evidence " 'sets the stage' for the charged offense." *Hale*, 2012 IL App (1st) 103537, ¶ 14 (quoting *People v. McFarland,* 259 Ill. App. 3d 479, 481 (1994)).

¶ 46    But the fact that defendant considered killing or even wanted or tried to kill the eyewitnesses—some of whom he actually saw (a woman with her baby, for example) as well as other witnesses hypothesized by his cellmate—did not help narrate events or explain some aspect of the crime that would otherwise be implausible. Defendant told his cellmate that he walked up to Curtis and shot him. Nothing about that simple story required the fact finder to know what else Curtis might have done or wanted to do.

¶ 47    Had defendant been on trial *not* for shooting Curtis but for shooting an eyewitness to Curtis's murder, we would understand why the fact finder might need to hear evidence of Curtis's murder to help explain defendant's motive for shooting the eyewitness; it would explain an aspect of that crime that might otherwise seem implausible. See *Hale*, 2012 IL App (1st)

103537, ¶ 14; *McFarland,* 259 Ill. App. 3d at 481. Here, however, defendant's thoughts or even his attempted actions, if not for the gun jamming, added nothing to the story of his murder of Curtis. It was an abuse of discretion to allow this testimony, as well.

¶ 48       It does not automatically follow, however, that these errors constituted reversible error. While the erroneous admission of other-acts evidence carries a high risk of prejudice and often requires reversal, the inadmissible evidence must be so prejudicial as to deny the defendant a fair trial. *People v. Cortes*, 181 Ill. 2d 249, 285 (1998) In other words, that evidence must have been a material factor in his conviction such that without it, the verdict would likely have been different. *Id.* Any such error is harmless beyond a reasonable doubt if the defendant is neither prejudiced nor denied a fair trial by the other-crimes evidence's admission. *People v. Nieves*, 193 Ill.2d 513, 530-31 (2000).

¶ 49       As defendant concedes, he "clearly admits to shooting the victim in numerous exchanges[.]" In fact, defendant points out at least four exchanges where he clearly confesses to a role in the murder, and there are more—admissible and unchallenged on appeal, all of them. The jury heard defendant, in his own voice, graphically and repeatedly describe why and how he killed the victim.

¶ 50       True, as defendant suggests, the entire conversation could have been chalked up to an inmate telling a tall tale to enhance his reputation, but the level of detail in the admissible portions of the recorded statement, including his statements about Sterlyn Woods, make it highly unlikely that defendant's story was a wholesale invention. Some puffing and self-promotion, perhaps, but the fact finder would nevertheless be left with repeated admissions to murder within the recorded statement. Under these circumstances, any erroneous admission of other-acts evidence was harmless beyond a reasonable doubt.

¶ 51          C. Unpreserved challenges to admission of defendant's statements

¶ 52          Defendant raises a challenge to one final set of defendant's recorded statements that likewise concerned the reason he did not shoot the female eyewitness and her baby:

"Montgomery: Ok...and you and your man did what ya'll had to do, the bitch was there, she seen but got a pass, you wasn't finna push the bitch shit back was you?

Defendant: What? Come on man. Was I finna. Tell you the truth, I was gonna, still when I saw the baby. My shit got jammed up so.My shit was jammed up. I was coming at her like this. I'm like this, tryina...

Montgomery: What you thought it was one of them ni--as?

Defendant: Nah, I just know it was a witness. Shit I just knew it was a witness. It was the witness.

Montgomery: I mean hey, that's the right thinking. The best witness is a dead witness...Can't talk.

Defendant: Yeah."

¶ 53          Defendant concedes that he did not preserve this error for review but claims that it is reversible under the first prong of the plain-error doctrine. See *People v. Herron*, 215 Ill. 2d 167, 187 (2005). We will find first-prong plain error in an unpreserved claim if a clear and obvious error exists, and the evidence was sufficiently balanced that the error tipped the scales in favor of the State and against defendant. *Id.*

¶ 54          Prejudice under the first prong of plain error rests on the closeness of the evidence, not the seriousness of the error. *People v. Sebby*, 2017 IL 119445 ¶ 68. If we find that the evidence was not closely balanced, we need not proceed further and will find no plain error. *People v. White*, 2011 IL 109689, ¶ 134 (because defendant could not show prejudice given

strength of evidence, court found "no reason to go further for purposes of *** closely balanced prong of plain error"); *People v. Scott*, 2015 IL App (4th) 130222, ¶ 34 ("Reviewing defendant's claim under the closely-balanced-evidence prong, we need not consider whether an error occurred because the evidence against defendant is overwhelming.").

¶ 55    For the reasons already given, we do not find the evidence closely balanced. Defendant repeatedly implicated himself, in detailed and graphic fashion, in Curtis's murder. We thus honor the forfeiture of this claim of error and deny plain-error relief.

¶ 56    For those same reasons, we reject defendant's argument that his attorney was ineffective for not objecting to this testimony. Defendant must show not only deficient performance but prejudice as well; that is, he must show a reasonable likelihood that the outcome of the trial would have been different had the evidence been excluded. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The prejudice analysis in *Strickland* is quite similar to the closely-balanced analysis of first-prong plain error when the claim is based on the erroneous admission of evidence. See *People v. White*, 2011 IL 109689, ¶ 133. For the same reasons we do not find the evidence closely balanced, we do not find a reasonable likelihood that the outcome of the trial would have been different had this evidence been excluded.

¶ 57    In sum, we find no error warranting reversal here. Defendant's conviction is affirmed.

¶ 58                                        II. Sentence

¶ 59    We next turn to his sentence. Defendant challenges his 40-year sentence in a multitude of ways. First, his sentence is excessive because the court failed to consider statutory mitigating factors which apply to him as a juvenile (725 ILCS 5/5-4.5-105(a) (West 2018)), and because it improperly considered a factor inherent in the offense of murder in aggravation. He also claims his sentence violates Illinois's proportionate-penalties clause because, though not a

life sentence, the court failed to consider his youth and its attendant characteristics. Lastly, he argues his counsel failed him at sentencing for not presenting mitigating evidence about his immaturity and the negative influences to which he was subjected.

¶ 60                                    A. Excessive sentence

¶ 61        Defendant first claims the court's sentence is excessive, because the court did not adequately consider statutorily mandated mitigating factors in Section 5-4.5-105(a) in the Unified Code of Corrections. That section applies whenever the court is sentencing a person who was younger than 18 years old at the time of the offense. See 730 ILCS 5/5-4.5-105 (West 2018). This section, enacted as part of the recent landslide of changes in juvenile sentencing law, requires a sentencing court to consider a variety of factors before it sentences a juvenile, in addition to making an otherwise mandatory firearm enhancements discretionary. *See People v. Holman*, 2017 IL 120655, ¶¶ 33-45 (discussing recent development in juvenile sentencing law, culminating in the General Assembly's adoption of Section 5-4.5-105).

¶ 62        As a threshold matter, the parties disagree over whether that section applies to this defendant at all. The State argues that since defendant committed his crime before its enactment, the plain language of the statute forbids him from using it, as it only applies to offenses committed after January 1, 2016, when the statute went into effect. In support, the State points to *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 152, where a different panel of this court agreed with that interpretation. Defendant says *Gunn* is wrongly decided, and that the language to which the State points is vague at best.

¶ 63        While there is reason to question *Gunn's* interpretation of 5-4.5-105(a) (*see People v. Clark*, 2021 IL App (1st) 180523-U, ¶¶ 142-151(Mikva, J., dissenting)), it ultimately makes no difference here. Even if that section applied to defendant, the court substantially complied with it

when it sentenced him.

¶ 64        Defendant presented substantial evidence of how his youth and its attendant characteristics influenced his participation in the murder, and the court made thoughtful observations about them before it sentenced him. That section does not require a court to strictly address and recite each its factors, nor are there "magic words" the court must first utter before we trust it considered the youthful characteristics of the defendant before it rendered judgment. *People v. Ruiz*, 2021 IL App (1st) 182401, ¶ 74. No single factor is dispositive, and we review the whole proceedings to ensure the trial court made an informed decision based on the totality of the circumstances at sentencing. *People v. Lusby*, 2020 IL 124046, ¶ 35.

¶ 65        We generally review an excessive-sentence claim for an abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36. We will not disturb a sentence unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the offense. *Id.* However, defendant suggests we take a *de novo* approach of the court's compliance with Section 105(a). While we are skeptical of his view, we need not decide it, as we would affirm the sentence under either standard of review.

¶ 66        Reviewing the evidence and arguments the parties presented in context with the court's finding, we are confident the court considered defendant's youth and its attendant circumstances when it sentenced him. Section 5-4.5-105(a) lays out nine factors the court shall consider before sentencing a juvenile. 730 ILCS 5/5-4.5-105(a) (West 2018). These factors were taken from the U.S. Supreme Court's opinion in *Miller v. Alabama*, 567 U.S. 460 (2012), forbidding mandatory life sentences for juveniles and discussing a juvenile defendant's youth and its attendant circumstances. *People v. Buffer*, 2019 IL 122327, ¶ 36.

¶ 67        Prior to sentencing, defendant submitted a sentencing memorandum. Drawing

parallels with the logic underpinning *Miller*, defendant argued that police had evidence that another person fired the shot that killed Curtis, and defendant's participation was highly motivated by "extreme" peer pressure. In support, he attached police reports which show that, while defendant did shoot Curtis, he only did so after the principal shooter, Lydell Johnson, had shot him in the head and killed him. Defendant also argued that he had a greater capacity to rehabilitate because he was young, just as the Supreme Court observed in *Miller*. With this memorandum, defendant presented evidence of his age, susceptibility to peer pressure, his higher potential for rehabilitation, and his degree of participation in the offense, four of Section 5-4.5-105(a)'s factors. 730 ILCS 5/5-4.5-105(a)(1), (2), (4), (6) (West 2018).

¶ 68       Counsel's efforts continued at sentencing, too. After the State had presented aggravating argument, counsel immediately pointed out that, while his client was a "man" now, when he committed the offense, he was only 17. Counsel argued his client was a "prime example" of what modern science now understood: that 17-year-olds were different than adults. Counsel then reiterated that his client only shot Curtis after Johnson already had, acting under "extreme peer pressure."

¶ 69       Lastly, counsel again argued his client could be rehabilitated—one of the key goals when sentencing anyone, not just a juvenile. Ill. Const. 1970, art I, §11; *People v. Franklin*, 2020 IL App (1st) 171628 (Illinois Constitution requires sentencing to balance twin goals of retribution and rehabilitation). Counsel argued that his client was a "salvageable" human being and asked the court to balance the seriousness of the offense with defendant's rehabilitative potential. This argument dovetailed neatly into counsel's sentencing memorandum and the factors laid out in Section 5-4.5-105(a).

¶ 70       The court also had a comprehensive presentence investigation to help. The PSI,

mostly based on an interview with the defendant, noted that he had a "shaky" childhood, never really knew his father, and had a sparce relationship with his mother, who was "here and there" when he was growing up. Defendant did not tell the investigator he struggled with mental illness but admitted he used marijuana every day when he was a child. And, importantly, the report noted that the defendant suffered from a learning disorder and did not graduate high school. The investigation illuminated defendant's family history, home environment, educational and social background, as well as his prior juvenile history for the court, more of Section 5-4.5-105(a)'s factors. 730 ILCS 5/5-4.5-105(a)(3), (8) (West 2018).

¶ 71     Given this clay to work with, the court made detailed and thoughtful findings before sentencing defendant. First, it took a recess to consider the arguments, giving itself time to step back and absorb what the parties had presented instead of rushing to judgment. When it returned, the court began by explaining it had reviewed the evidence from trial, the PSI, the "history, character and attitude of the defendant," and what the parties presented in aggravation and mitigation. It recognized the serious nature of the offense but acknowledged that it also must try to restore defendant to useful citizenship. The court's comments show it was well aware of its duty and the interests it had to balance.

¶ 72     And when it came time to credit defendant's youth and its attendant circumstances, it gave them great credence. The court recognized defendant was "quite young" when he shot Curtis. The court also recognized that the defendant acted under peer pressure, acknowledging his argument that others influenced him to commit the crime. It noted defendant's upbringing, said he presented himself in court as a "mannered person, always very respectful, soft spoken." And lastly, it acknowledged defendant's "shaky" childhood experience, but observed the people defendant was in contact with regularly were law-abiding and productive members of society. In

short, the court comprehensively walked through the evidence before it.

¶ 73    We highlight this in depth to illustrate how thorough the court was when it sentenced the defendant. From this, it is clear the court adequately considered his youth and its attendant circumstances—they were indeed on the forefront of its mind. While there are nine factors listed in Section 105(a) for the court to consider, it is not a rote checklist the court must mark off before it may sentence a juvenile defendant. The court is not required to articulate each and every factor it considers in rendering a sentence. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74. And just because it does not explicitly mention one does not mean it did not consider it an important or relevant factor. *Id.*

¶ 74    The court here had plenty of evidence of defendant's youth and its attendant characteristics before it and did far more than make a passing comment about defendant's young age. *Cf. People v. Nieto*, 2020 IL App (1st) 121604-B, ¶ 59 (court did not consider defendant's youth and its attendant circumstances despite it saying it considered defendant's young age without evidence it considered the corresponding characteristics of defendant's youth.)  When mitigating factors have been presented to the court, we presume it considered them, absent some indication to the contrary. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 54. There is nothing here that indicates the court did not consider the mitigating factors defendant presented; to the contrary, there is every indication it considered all of defendant's mitigating evidence. Despite defendant's claim, the court did substantially comply with Section 5-4.5-105(a), and its sentence is not excessive.

¶ 75    Next, defendant takes exception to one comment the court made at sentencing. When announcing sentence, the court noted it considered "the harm that was caused by the acts of the defendant" in aggravation. This, defendant says, suggests the court considered Curtis's death—

an element inherent in the murder charge—as an improper aggravating factor. He admits he did not preserve this error for appeal but asks us to consider it as plain error. See Ill. S. Ct. R. 615(a). (eff. Jan. 1, 1967). In arguing for plain error, a defendant bears the burden of proving that there was a clear or obvious error during sentencing proceedings and 1) the evidence at sentencing was closely balanced; or 2) the error was so egregious it deprived defendant of a fair sentencing hearing. *People v. Hillier*, 237 Ill.2d 539, 546 (2010). Defendant bears the burden under either prong (*id.*), and he argues this error meets both. But first, we must determine if the court erred at all. *People v. Thompson*, 238 Ill. 2d 598, 614 (2010).

¶ 76      A court cannot consider a factor implicit in the offense as aggravating at sentencing because it cannot be used both as an element of the offense and to impose a harsher punishment. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). This "double enhancement" is prohibited because we presume the legislature considered the factor when it set a sentencing range for the charged offense. *Id.* at 12. There is a strong presumption that the circuit court used proper reasoning in determining a sentence, and the defendant must affirmatively establish that the court used a flawed, improper consideration to successfully challenge it. *People v. Cook*, 2021 IL App (3d) 190243, ¶ 47.

¶ 77      The defendant has not carried his burden here to overcome the strong presumption the court used proper reasoning at sentencing. We find no indication that the "harm" the court referenced was Curtis's death. The court's comment may have referred to the witnesses defendant threatened—which the State argued were circumstances that the court should properly consider as aggravating. *See* 730 ILCS 5/5-5-3.2(a)(1) (West 2018) (defendant's conduct that "threatened serious harm" is proper factor in aggravation.) And as the State points out, the court may also have misspoken when it used the word "harm" but was contextually speaking to the

serious nature of the crime the defendant committed. Either way, defendant has not affirmatively established that this vague comment proves the court subjected him to a double enhancement. Since we cannot find a clear or obvious error, there cannot be a plain one.

¶ 78       Even assuming the court did improperly consider an element of the offense as aggravating, the court did so in passing, and defendant's sentence on the murder charge, less the firearm enhancement, was the minimum time allowed for first-degree murder. 720 ILCS 5/5-4.5-20 (West 2018). The court could have punished him harsher but did not. That, too, suggests the court did not doubly-enhance defendant's sentence. See, *e.g.*, *Cook*, 2021 IL App (3d) 190243, ¶ 49 (no double enhancement after court made passing comment about defendant's prior criminal convictions, used as an element of the offense of Armed Habitual Criminal, when the sentence was substantially below the maximum the statute permitted). Either way, defendant's challenge falls short, and his sentence is not excessive.

¶ 79                     B. Proportionate-Penalties challenge

¶ 80       Defendant also attempts to attack his sentence using the proportionate-penalties clause of our state constitution. See Ill. Const. 1970, art. I, § 11. He claims his sentence must be set aside because it is a "near *de-facto* life sentence" imposed without adequate consideration of his youth and its attendant circumstances. Defendant does not allege his 40-year sentence, standing alone, offends the clause. Rather, he takes issue with how it came to be: in his reading, the clause mandates the court consider his youth and its attendant characteristics before it imposes a sentence as serious as his is, even if is not for life. A penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral senses of the community. *People v. Sharpe*, 216 Ill. 2d 481, 517 (2005). Here, defendant believes that it shocks the moral sense of the community to impose a "near-life"

sentence without the protections generally afforded juvenile offenders facing life sentences.

¶ 81      A bit of background may provide useful to understand what defendant is asking. Although he cannot plant in the same ground, defendant's challenge has roots in recent developments in the law interpreting the eighth amendment of the federal constitution as it applies to juvenile offenders. The eighth amendment of the U.S. Constitution forbids cruel and unusual punishments. See U.S. Const., amend. VIII. Beginning with *Graham v. Florida*, 560 U.S. 48 (2010) and culminating in *Miller*, 567 U.S. 460, the Supreme Court held that the eighth amendment forbids mandatory life sentences for juveniles.

¶ 82      Mandatory life schemes run afoul of the constitution because they remove consideration of youth from the determination of whether to impose the harshest sentence. *Miller*, 567 U.S. at 479. The constitution compels the sentencing court to consider an offender's youth and its attendant circumstances before it may impose such a sentence. *Id.* at 483. *See also People v. Dorsey*, 2021 IL 123010, ¶¶ 37-41 (discussing the development of juvenile sentencing law post-*Miller*, including Illinois interpretation of it.) The eighth amendment allows a juvenile to be sentenced to life in prison, however, so long as the sentence is not mandatory, giving a court discretion to consider youth and its attendant circumstances before imposing punishment. *Jones v. Mississippi*, 593 U.S. -----, ----, 141 S.Ct. 1307, 1314-15 (2021).

¶ 83      In *Buffer*, our supreme court declared that a *de facto* life sentence for a juvenile in Illinois is any sentence more than 40 years. 2019 IL 122327, ¶¶ 36-39. Thus, a sentence of 40 years or less does not trigger *Miller*-type eighth amendment protections. *Id.* at ¶ 41. Since his sentence is for 40 years, *Buffer* stops this defendant from using the eighth amendment to attack his sentence.

¶ 84      So he reaches for our state constitution's proportionate-penalties clause instead. He

argues that it provides more expansive protection against disproportionate punishment, such that he may use the protections developed by *Miller* and its progeny to compel a court to consider his youth and its attendant circumstances in this situation, even if the eighth amendment is not offended by the sentence.

¶ 85    The proportionate penalties clause, which is similar to but not identical with the eighth amendment, provides that all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. *In re Shermaine S.*, 2015 IL App (1st) 142421, ¶ 28 (citing Ill. Const. 1970, art I., § 11). Our supreme court "has not spoken consistently on the relationship between our proportionate penalties clause and the eighth amendment." *People v. Coty*, 2020 IL 123972, ¶ 45. However, defendant is right that our supreme court has previously noted that the proportionate penalties clause provides a "limitation" on penalties beyond those afforded by the eighth amendment. *People v. Clemmons*, 2012 IL 107821, ¶ 39; *cf. People v. Patterson*, 2014 IL 115102, ¶ 106 (stating the proportionate penalties clause is "co-extensive with the eighth amendment's cruel and unusual punishment clause.").

¶ 86    A sentence that passes muster under the eighth amendment will nevertheless violate our proportionate penalties clause when it shocks the moral sense of the community. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 69. It is unclear, however, if the "limitation" the court spoke of in *Clemmons* extends to providing the kinds of protections the defendant now asks for, and we can find no decision that says it does.

¶ 87    But we need not settle that question because, as already noted, defendant here received a comprehensive sentencing hearing, and the court more than adequately considered defendant's youth and its attendant circumstances before it imposed a 40-year sentence. Nothing

that happened here was so cruel or degrading as to shock the moral sense of the community. In fact, if defendant had received a *de facto* life sentence rather than the one he did after this sentencing hearing, neither our constitution nor its federal counterpart would have had a problem with it.

¶ 88        Our analysis above helps illustrate why. The list of factors in Section 5-4.5-20 was taken directly from *Miller*. See *Buffer*, 2019 IL 122327, ¶ 36. So defendant was already given and used the very tools he seeks to force upon the court. As already noted, defendant presented evidence both of his young age and how peer pressure may have influenced him into committing this crime. The PSI gave the court ample information about his educational, familial, and psychological background and upbringing. The court thoughtfully considered a variety of factors before sentencing defendant after taking time to absorb all it was given. Before this sentence was imposed, the court substantially considered defendant's youth and its attendant characteristics.

¶ 89        Defendant tries to liken his case to *People v. Aikens*, 2016 IL App (1st) 133578, but that decision is easily distinguishable. There, the defendant claimed his 40-year sentence for attempt murder, when coupled with his potential to rehabilitate, shocked the evolving standards of moral decency. *Id.* ¶ 37. Aikens had no prior criminal history, and a mitigation specialist who testified at sentencing said that he was likely to fully rehabilitate and become a contributing member of society. *Id.* And importantly, the defendant in *Aikens* was convicted of *attempt* murder, and while it was a serious crime, nobody was injured. *Id*. ¶ 37. We reversed his 40-year sentence and remanded for resentencing in accordance with Section 5-4.5-20. *Id.* ¶ 38.

¶ 90        In stark contrast, defendant here shot a man in the head, execution-style. Defendant also did not present any evidence from a mitigation specialist, nor did he offer the wealth of mitigating information the defendant did in *Aikens*. The court fully considered the mitigating

evidence the defendant did offer, and it was aware of his youth and its attendant circumstances before it sentenced him. *Aikens*, like the proportionate penalties clause, does not help him, and his sentence is constitutional.

¶ 91                                    C. Ineffective assistance

¶ 92      Lastly, defendant claims that sentencing counsel failed him by not presenting additional mitigating evidence at sentencing that would have suggested defendant helped kill Curtis to enhance his social standing. Remember that counsel did present evidence, in a sentencing memorandum, that Sterlyn Woods told Detective Casale that defendant was involved in the shooting but only shot Curtis after the principal shooter, Lydell Johnson, had fatally shot him in the head. Relying again on Casale's interview with Woods, defendant claims that counsel should have also presented evidence that Woods said defendant was motivated to help in the shooting to earn recognition among the group. This information would have highlighted how susceptible defendant was to the influence of others and willing to do what was asked of him to impress Woods, Johnson, and others.

¶ 93      But this information only replicated the argument counsel aptly made, both in the sentencing memorandum and at sentencing: that defendant's crime was motivated in part because he was subjected to outside influences and peer pressure. Counsel made a strong case that his client could be rehabilitated absent those influences, and that argument appeared to sway the court to sentence him to something less than a life sentence in prison. Even if counsel had presented this additional snippet of information from Woods, we cannot see how the outcome would be any different here.

¶ 94      We evaluate claims of ineffective assistance of counsel under the two-pronged test of deficient performance and prejudice set forth in *Strickland*, 466 U.S. 668. The defendant must

allege facts that demonstrate counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Enis*, 194 Ill.2d 361, 376-77 (2000). Both prongs must be met; the failure to show either precludes a finding that counsel was ineffective. *Id.* We may thus dispose of an ineffective assistance claim by proceeding directly to prejudice without addressing counsel's performance. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 95    Here, defendant cannot prove there is a reasonable probability that, had counsel presented this information, the outcome here would have been any different. The court sentenced defendant to the minimum time the law allows for first-degree murder, 20 years (730 ILCS 5/5-4.5-20 (West 2018), but it did elect to impose the discretionary 20-year firearm enhancement because the jury found he personally discharged a firearm. So to prevail, defendant must establish that, had counsel presented the additional information from Woods, there is a reasonable probability that the court would not have imposed the firearm enhancement.

¶ 96    He cannot do so here, particularly when the evidence in question merely repeated what the court already heard. It is highly unlikely that, had the court heard this small additional snippet of information, it would have reversed course and not imposed the enhancement. The court was well aware of defendant's youth and its attendant circumstances, particularly how vulnerable he was to peer pressure. It recognized that pressure may have motivated him to shoot Curtis. Despite that, it believed it was appropriate to impose the firearm enhancement. Nothing that defendant presents here would have swayed it otherwise. As defendant cannot show he was prejudiced by counsel's possible shortcomings, his claim fails.

¶ 97                                    CONCLUSION

¶ 98        Defendant's conviction and sentence is affirmed.

¶ 99        Affirmed.